**UNITED STATES of America,**
**Plaintiff,**

v.

**SCHOOL DISTRICT OF FERNDALE,**
**MICHIGAN, et al., Defendants.**

**Civ. A. No. 75–70958.**

United States District Court,
E. D. Michigan, S. D.

July 3, 1975.

See also, D.C., 400 F.Supp. 1131, D. C., 400 F.Supp. 1135 and D.C., 400 F. Supp. 1141.

**1124**

Edward H. Levi, Atty. Gen., J. Stanley Pottinger, Asst. Atty. Gen., Alexander C. Ross, Thomas M. Keeling, J. Gerald Hebert, Attys. U. S. Dept. of Justice, Washington, D. C., and Ralph B. Guy, U. S. Atty., E. D. Mich., Detroit, Mich., for plaintiff.

Burton R. Shifman, Philip J. Goodman, Southfield, Mich., for Ferndale School Dist.

Frank J. Kelley, Atty. Gen., and Thomas F. Schimpf, Asst. Atty. Gen., Lansing, Mich., for State defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

KENNEDY, District Judge

The Attorney General of the United States instituted this action against the School District of Ferndale, Michigan, and various Ferndale School District officials (Local defendants) and the State of Michigan, Michigan State Board of Education, and several state officers (State defendants), alleging, in essence, that the defendants built and have maintained the Grant Elementary School for the purpose and with the effect of segregating black elementary school students (K through 6th grades) and have assigned faculty to Grant on the basis of race [Complaint, para. 10]. In addition, the complaint charges that the State defendants have utilized federal financial assistance (Revenue Sharing) in a manner tending to support a racially discriminatory program through the "allocation of revenue sharing funds to the public school retirement system on behalf of Ferndale District employees." [Complaint, para. 17].

Both groups of defendants have filed motions to dismiss the complaint insofar as its claims are based on the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1701 et seq., and on the Fourteenth Amendment to the Constitution of the United States.[1]

The Equal Educational Opportunity Act contains a list of practices deemed to be denials of equal educational opportunity, 20 U.S.C. § 1703; authorizes suits to remedy denials of equal educational opportunity, 20 U.S.C. § 1706; and establishes a system of remedy principles and procedures to govern court orders designed to correct denials of equal educational opportunity. 20 U.S.C. §§ 1712–18.

The motions to dismiss are based on the contention that The Attorney General has not properly brought the action under 20 U.S.C. § 1706. That section provides:

An individual denied an equal educational opportunity as defined by this part may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate. The Attorney General of the United States (hereinafter in this title referred to as the "Attorney General"), for or in the name of the United States, may also institute such a civil action on behalf of such an individual.

The basic question is the interpretation of "on behalf of such an individual." The complaint does not name or describe any "such individuals" that is, those denied equal educational opportunity, as being those on whose behalf the action is brought.[2] Defendants assert that the

---

1. The third basis upon which the United States has brought the suit, 31 U.S.C. § 1242(c), relates to the use of revenue sharing funds and is not challenged by either motion to dismiss.

2. Paragraph 20 of the complaint does state, however, that the practices of the defendants "deny equal protection of the laws and equal educational opportunity to black students and faculty in the elementary schools in Ferndale." The effect of this paragraph is discussed later in this Opinion.

Attorney General must name, or at least describe, the individuals on whose behalf the action is brought.

The United States has responded that it believes that the only prerequisites to institution of a suit under the Act have been met. As required by 20 U.S.C. § 1710, the Attorney General has given notice to the appropriate educational agency of the alleged violations and certification to the Court that the educational agency has not taken appropriate remedial action.

Both sides have extensively briefed and argued the issue. Each cites a dictionary definition of "on behalf of." The United States asserts that the phrase means "in the interest of," quoting Webster's New World Dictionary. The State defendants counter with the American Heritage Dictionary, which contrasts "in behalf of"—defined as "in the interest of," with "on behalf of"—which means "as the agent for." Insofar as such authorities are helpful, the Court is of the opinion that the weight of lexicographical authority rests with the defendants. Webster's New International Dictionary says that "in behalf of" means "in the interest, support or defense of" while "on behalf of" is defined as "on account of; on the part of; in the name of; for." Unfortunately, these definitions are not completely satisfactory, since they are not free from ambiguity themselves, and since there is no way of knowing which shade of meaning was intended by Congress in adopting the "on behalf of" language.

The majority of court decisions are not too helpful, since most of the cases interpreting the critical phrase are cases dealing with contract and agency principles, presupposing the answer. *See, e.*

*g., White v. Transit Casualty Co.,* 402 S.W.2d 212, 215 (Tex.Civ.App.1966).

One of the few cases directly interpreting a legislative use of the phrase is *Commissioner of Internal Revenue v. Shamberg's Estate,* 144 F.2d 998, 1006 (2d Cir. 1944). There, the Court was interpreting a treasury regulation prescribing certain tax treatment from securities issued by or "on behalf of" a state or political subdivision of a state. The Court concluded that bonds issued by the Port of New York Authority were issued "on behalf of" the states of New York and New Jersey. The import of such a decision is inconclusive. The two states were not obligated on the bonds issued by the authority; on the other hand, the authority performs public functions and was created by the states involved. Certainly, the case implies that there must be some direct connection between the issuing agency and the state.

Both sides also analogize to prior civil rights acts in an attempt to find a general pattern of Congressional enactments that would help to construe this Act. Defendants rely on the education provisions of the Civil Rights Act of 1964, particularly 42 U.S.C. § 2000c–6.[3] They argue that since this section requires a complaint before institution of an action by the Attorney General, and since certain other civil rights statutes, such as 42 U.S.C. §§ 1981, 1983, 1985 and 2000b require that the persons deprived of their rights bring the action that "this intent was obviously incorporated in the language of 20 U.S.C. § 1706 by the requirement that the Attorney General sue on behalf of such an individual." Brief of Local defendants at 3.

The response of the United States is that Congress has adopted a number of

3. Whenever the Attorney General receives a complaint in writing—

· · · · ·

and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief

and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized . . . to institute for or in the name of the United States a civil action . . . against such parties and for such relief as may be appropriate · · · ··

other civil rights statutes which do not impose such a complaint requirement. *See, e. g.*, 42 U.S.C. § 2000e–6(a) (employment discrimination); § 3613 (housing discrimination); § 2000a–5 (discrimination in public accommodations); and §§ 1971(c), 1973h(b), 1973j, 1973aa–2 and 1973bb–2 (voting discrimination). The Government concludes that the omission of the complaint requirement signifies that inclusion of "aggrieved persons" is not required.

The analysis of prior civil rights enactments is of limited value here. Congress has adopted various schemes, some of which require involvement in an action brought by the Attorney General by those whose rights are denied, and some of which do not. The conclusion that a complaint is not required by section 1706 is clear, but since none of the other statutes contain the "on behalf of" language, it is difficult to draw any conclusion about the effect of the inclusion of that phrase in section 1706.

■ The legislative history of the Act is also not of much assistance in interpreting this section. In both houses of Congress the Equal Educational Opportunity Act was offered as an amendment from the floor to the Education Amendments of 1974. As a result, there are no committee reports or hearings on the measure during that session.[4] However, the amendments proposed on the floor were essentially the same as the comparable provisions of the proposed Equal Educational Opportunity Act of 1972, H.R. 13915, 92d Cong., that was passed by the House but not the Senate in 1972. There were extensive hearings held on that measure during 1972, and the House Committee on Education and Labor reported the bill. Each house also conducted a substantial floor debate on the measure. The language of 20 U.S.C. § 1706 was contained in its present form in H.R. 13915. The Court believes that it is appropriate to consider the history of H.R. 13915 in interpreting section 1706.

The legislative history is striking for its scant concern for the enforcement provisions.[5] Those references that can be found to the provisions authorizing suits generally do not mention the "on behalf of" language.[6] The Court is of

---

4. The conference report merely recites the provisions included without giving any interpretation. See 1974 U.S.Code Cong. & Admin.News 4206.

5. These measures are generally referred to as the "anti-busing" amendments. Most of the hearings and debates centered around the wisdom and effectiveness of the various remedy provisions as they related to the transportation of students as a remedy in school desegregation cases. As Congressman Esch said in proposing the amendment which was eventually passed in the House ("Esch Amendment"):

The purpose of the amendment is to clearly indicate that the intent of the House of Representatives is to disapprove cross-district busing such as that which has created a great deal of unrest and uncertainty in the minds of those in the Greater Detroit area. The purpose clearly, when the act was passed by this House overwhelmingly in August of 1972, was to suggest that, while we recognize that every child should have an opportunity to be fully educated, the House went on record as emphasizing that the education should be

done insofar as possible in a neighborhood school.
120 Cong.Rec. H2161 (daily ed. May 26, 1974).

6. The only such reference that the Court has been able to find in the 1974 proceedings is a statement by Senator Allen during the floor debate "the probusing Senators see in this act—and correctly so—a right created in individuals and power granted to the U. S. Attorney General to bring suits for a denial of equal educational opportunites." 120 Cong.Rec. S8154 (daily ed. May 15, 1974). In 1972, Congressman Puchinski, in discussing the House report on H.R. 13915 stated:

This act has as its basic purpose the laying out of 'ground rules' regarding segregation in public schools. It defines for the first time in Federal Law 'equality of educational opportunity,' and it absolutely bars a State from denying this equality to any individual. It also authorizes civil actions by the Attorney General and by persons being denied this equality.
118 Cong.Rec. 28835 (Aug. 17, 1972).
The report of the House Committee on Education and Labor on H.R. 13915 makes sev-

the opinion that little weight can be attached to such statements that do not appear to have been important to those making them.

The Local defendants urge that the rejection by the House of the so-called "Anderson Amendment," which was proposed as a substitute for the Esch Amendment, supports its position. That proposal had a different formulation of the civil actions section. It would have provided:

> Sec. 1413. (a) Any person or persons alleging, or the Attorney General if he has reasonable cause to believe, that any policy or measure of a local educational agency violates section 1411 of this title [which enumerates violations of equal educational opportunity] may bring a civil action in the appropriate United States district court for equitable relief . . . .

120 Cong.Rec. H2167 (daily ed. March 26, 1974).

This proposal was rejected and the language of the corresponding section of the Esch Amendment was eventually adopted as part of the Act.

This sequence does not materially help in determining what Congress intended by this language. The Anderson Amendment was a complete substitute for the Esch Amendment, rather than a suggested revision of the civil actions section. Neither Representative Anderson's justification for his proposal [7] nor the reasons given by the Esch Amendment supporters for rejecting the substitute [8] refer to the differences in the civil actions section as an important consideration to their positions.

In view of the lack of a clear meaning on the face of the statute of the import of this provision and the lack of clear Congressional explanation, the Court believes that the language "in behalf of" should be construed in a way that is consonant with the expressed general purposes of the legislation.

It is abundantly clear that the Act—both as proposed in 1972, and as enacted in 1974—was intended to limit the scope of the remedies to be employed in school desegregation cases.[9]

The language of the remedies section itself indicates that the steps to be taken

---

eral references to that section. The general description of the bill states:

> The committee bill for the first time in Federal law contains an illustrative definition of a denial of equal educational opportunity. It is the purpose of that definition, title II of the bill, and of the authorization of civil actions by aggrieved individuals and by the Attorney General, title III, to provide school and governmental authorities with a clear delineation of their responsibilities to their students and employees and to provide the students and employees with the means to achieve enforcement of their rights.

House Report 92–1335, at 3 (hereinafter House Report).

The report also contains a separate discussion of the title of the bill containing the enforcement provisions:

> Title III of the committee bill authorizes civil actions in Federal courts by individuals denied an equal educational opportunity. The Attorney General may also institute civil actions on behalf of such individuals or he may intervene in actions already instituted.
>
> . . . . .

> The provisions of this title do not in any way repeal the authorization of actions contained in the Civil Rights Act of 1964. The authorization in this bill is meant to be in addition to those provisions.

House Report at 6–7.

7. Congressman Anderson expressed the view that he felt his version would not so drastically limit the possible remedies that courts could use to redress violations of the Act. See 120 Cong.Rec. H2170–71 (daily ed. March 26, 1974).

8. The objections were directed to the failure of the Anderson Amendment to contain certain prohibitions on court orders and on its failure to provide that if a school system provided a racially non-discriminatory attendance system, it would not be in violation of the Act. See, e. g., remarks of Representative O'Hara, 120 Cong.Rec. H2171–72 (daily ed. 19, March 26, 1974).

9. For example, the 1972 House Report states:

> The [remedies] title, first of all, requires that these Federal courts, departments and agencies may only impose such remedies as are essential to correct particular

by a court are to focus on particular denials of equal educational opportunity. 20 U.S.C. § 1712 states;

> In formulating a remedy for a denial of equal educational opportunity, or a denial of the equal protection of the laws, a court, department, or agency of the United States shall seek or impose only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws.

20 U.S.C. § 1712.

The approach adopted in this measure by the Congress appears to be in contrast to the view that the Attorney General should be able to bring suits to vindicate some national policy as opposed to individual rights.[10]

There had been some indication that the courts regarded school desegregation cases as involving the vindication of the public interest. In *Bradley v. Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L. Ed.2d 476 (1974), the Supreme Court said, in the context of the question of awarding attorney's fees:

> School desegregation litigation is of a kind different from "mere private cases between individuals." . . . In this litigation the plaintiffs may be recognized as having rendered substantial service both to the Board itself . . . and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system.

416 U.S. at 718, 94 S.Ct. at 2019.

Congress's enactment of the Equal Educational Opportunity Act of 1974, directs that in suits brought thereunder to correct violations of equal educational opportunity, it is the individual rights of those discriminated against that are to be vindicated, not a national policy of school desegregation.

■ If the "on behalf of" language is to be interpreted consistently with this general intent of the legislation, it would appear that the Attorney General should be required to designate those who have been denied equal educational opportunity and on whose behalf the suit is brought. Such a requirement would be of help to individuals in determining whether they should seek to intervene in the action, and would direct the court and the parties to the particular wrongs claimed by the United States to require a remedy.

The Court does not believe that this requires naming of individuals, but rather that a similar specificity should be required to that which is appropriate in class actions in which one or more parties litigate "on behalf of all". Rule 23, Federal Rules of Civil Procedure. The general rule is that a class must be set forth with "sufficient definiteness so that it is administratively feasible for the court to determine whether a particular individual is a member." 7 Wright and Miller, *Federal Practice and Procedure*, § 1760, at 581.

■ The present complaint does not so specify those on whose behalf the case is brought. Paragraph 20 does state in conclusory fashion that black elementary school students *and faculty* have been denied equal educational opportunity, but this cannot be taken to be a statement that the case is brought on

---

denials of equal educational opportunity and equal protection as regards education. This provision means that courts are not to use law suits against school districts as occasions for imposing free-wheeling requirements on these school districts. Rather, they must restrict themselves to the particular facts and circumstances of the cases.

10. This is in contrast to some other civil rights legislation in which there had been

found to be a national interest to be vindicated in enforcing civil rights. See *United States v. Luebke*, 345 F.Supp. 179 (D.Colo. 1972) (housing discrimination); *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (voting discrimination). Cf. *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963) (discrimination in public accommodations).

behalf of those persons. This is particularly so because the inclusion of the faculty is inconsistent with the purposes of the Act.[11]

Requiring identification of the persons on whose behalf the action is brought does not defeat the remedial purpose of the Act. The Attorney General is required by 20 U.S.C. § 1710 to notify the educational agency of the violations charged before bringing the suit. Thus at the time the complaint is filed the Attorney General will be aware of the identities of the persons who he claims have been denied equal educational opportunity. During oral argument on these motions, the Court asked counsel for the United States whether it would cause any particular problems to require such an identification of the individuals. Transcript of June 23, 1975, at pages 43, 59. Counsel did not advise the Court of any such problems.

Accordingly, the defendants' motions to dismiss the complaint are granted as to the claim under 20 U.S.C. § 1701 et seq. Plaintiff will be permitted to amend its complaint to specify the person or persons on whose behalf the action is brought.

■ In their challenge to the standing of the Attorney General to raise claims based on alleged denials of Fourteenth Amendment rights of other persons, the defendants rely on the general principle that one may not assert the constitutional rights of another. See Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943); Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The United States Supreme Court has recently reaffirmed the principle that a litigant "cannot rest his claim to relief on the legal rights or interests of third parties."

Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The requirement that the individuals on whose behalf the action is brought be identified reflects the constitutional requirement of an actual case and controversy underlying standing doctrines.

Plaintiff contends that a number of courts have created an exception to this principle and permit the Attorney General of the United States to sue to enforce the Fourteenth Amendment rights of citizens. The cases relied upon are United States v. City of Jackson, 318 F. 2d 1 (5th Cir. 1963), United States v. Brittain, 319 F.Supp. 1058 (N.D.Ala. 1970), and United States v. Brand Jewelers, 318 F.Supp. 1293 (S.D.N.Y.1970).

The Court does not believe that the cited cases provide a basis for adopting the proposition suggested by plaintiff. In Jackson, the 5th Circuit found that the racially discriminatory policies adopted in the operation of train and bus terminals imposed an unacceptable burden on interstate commerce. Thus, the United States had an interest of its own, evidenced by the Congressional regulation of the field, upon which the Court concluded that the Attorney General had the authority to sue.

Brittain involved a suit to enjoin the operation of a miscegenation statute. The district court does not really treat the issue of standing in detail. Insofar as it is discussed, the court clearly regarded the United States as having an interest of its own to protect in bringing the action.

In Brand, the court first found standing under a long line of cases giving the Attorney General the right to sue to remove burdens on interstate commerce. As an alternative ground, the court did state that the Attorney General has an

11. The faculty are presumably not within the class of persons protected by the Act. Section 1703 provides that no state shall deny equal educational opportunity by: "discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assign-

ment to schools of its faculty or staff . . . ." However, the clear implication of this section is that it is the students in the schools operated in such a fashion that are denied equal educational opportunity. The Act is not designed to remedy discrimination against faculty members.

independent basis for the suit in the claim of deprivations of Fourteenth Amendment rights. However, the cases relied upon by the district court do not justify so sweeping a conclusion. *Jackson,* as noted above, was firmly founded on the commerce clause, and the other opinion relied upon, the dissent of Judge Brown in *United States v. State of Mississippi,* 229 F.Supp. 925, 976 (S.D. Miss.1964), *rev'd,* 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965), was dictum since the Civil Rights Act of 1957 had clearly given the Attorney General the authority to sue.

■ The Court believes that in the area of school desegregation litigation the Attorney General does not have standing to sue to remedy the denial of Fourteenth Amendment rights to individuals without statutory authorization. In *United States v. Greenwood Municipal Separate School District,* 406 F.2d 1086 (5th Cir. 1967), a case brought under the education provision of the Civil Rights Act of 1964, the Court implied that standing was granted by the Act: "Having issued a certificate in conformity with the statute, he acquires standing to sue." 406 F.2d at 1090. This case, of course, was directly concerned with the question of whether the court could review the Attorney General's certification, rather than the question of independent basis for standing under the Fourteenth Amendment.

In *United States v. Madison County Board of Education,* 326 F.2d 237 (5th Cir. 1964), the court rejected the contention that "violations of the Fourteenth Amendment rights of the children of members and employees of the Armed Forces burdens the exercise of the war power." 326 F.2d at 242. Implicit in such a conclusion is that the denial of Fourteenth Amendment rights alone would not support an action by the Attorney General.

Finally, in *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir. 1967), the court commented on the *Madison County* decision:

The United States sued to desegregate the schools. The United States was either 1) attempting specifically to enforce the assurance [regarding non-discriminatory treatment of dependents of federal employees] or 2) attempting to protect the constitutional rights of persons not parties to the suit. The suit was brought before Title IV of the Civil Rights Act of 1964 provided the necessary statutory foundation for the Attorney General to sue to assure individuals of the constitutional right to a desegregated education.

370 F.2d at 851.

■ In this case there is no statutory expression of a national interest of the United States in the subject matter of this case, other than the Civil Rights Act of 1964, and the Equal Educational Opportunity Act of 1974, both of which contain specific authorization for suits by the Attorney General. The Court believes that this brings the case within the principle adopted in *Madison* County:

A general liability created by statute without a remedy may be enforced by an appropriate common-law action. But where the provision for the liability is coupled with a provision for a special remedy, that remedy, and that alone, must be employed.

326 F.2d at 242, quoting *Pollard v. Bailey,* 87 U.S. 520, 527, 22 L.Ed. 376 (1874).

If the construction urged by the United States is correct, the provision of several civil rights acts authorizing actions by the Attorney General, frequently under limited circumstances, would be superfluous.

Accordingly, the Motions to Dismiss are granted as to the allegations that the complaint is brought under the Fourteenth Amendment.

■ The Court notes that the allegations regarding revenue sharing are different in a number of respects from the claims seeking remedies under the

Equal Educational Opportunity Act of 1974. To a considerable extent they arise from different transactions or occurrences. These claims seek quite distinct remedies and may require quite different procedures, for example, in the treatment of the findings of the Department of Health, Education and Welfare in the proceedings outlined in paragraph 11 of the complaint. Certainly, separate statement of these claims will facilitate the clear and orderly presentation of the matters set forth in each. Therefore, in the event that an amended complaint is filed, the Court directs plaintiff to state the respective claims relating to revenue sharing and to equal educational opportunity into separate counts. Federal Rules of Civil Procedure, Rule 10(b).

It is so ordered.