### UNITED STATES of America

v.

### Dr. Neil SOLOMON, Secretary of Health and Mental Hygiene of the State of Maryland, et al.

### Civ. A. No. N–74–181.

United States District Court, D. Maryland.

July 8, 1976.

---

Edward H. Levi, Atty. Gen., J. Stanley Pottinger, Asst. Atty. Gen., Civil Rights Div., Louis M. Thrasher, Director of Office of Special Litigation, Civil Rights Div., Washington, D.C., Jesse H. Queen, Michael S. Lottman, Mickey A. Steiman, Susan Lentz, Attys., Dept. of Justice, Washington, D.C., and Jervis S. Finney, U.S. Atty. for the District of Maryland, Baltimore, Md. (Louis M. Thrasher, Washington, D.C., presenting oral argument at hearing), for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland and Paul Walter, Paul M. Vettori, Stephen Sfekas and Judith K. Sykes, Asst. Attys. Gen., Baltimore, Md. (Paul Walter, Stephen Sfekas and Judith K. Sykes, Baltimore, Md., participating in presentation of oral argument), for defendants.

Robert P. Kane, Atty. Gen. of Pennsylvania, J. Justin Blewitt, Jr., Chief, Civ. Litigation, Harrisburg, Pa., Norman J. Watkins, Jeffrey Cooper, Deputy Attys. Gen., Harrisburg, Pa., on amicus curiae brief in behalf of the Commonwealth of Pennsylvania.

John L. Hill, Atty. Gen. of Texas, Austin, Tex., David M. Kendall, Thomas W. Choate, and Richel Rivers, Asst. Attys. Gen., Austin, Tex., on amicus curiae brief in behalf of the State of Texas.

NORTHROP, Chief Judge.

The Attorney General of the United States has brought this suit on behalf of the United States seeking to enjoin certain practices and policies of the officials of the State of Maryland primarily charged with the responsibility of administering Maryland's programs for the care and training of mentally retarded citizens. The Complaint alleges that the defendants' policies and practices have resulted in severe and widespread deprivation of the rights guaranteed by the eighth, thirteenth, and fourteenth amendments of the Constitution to residents of Rosewood State Hospital, Maryland's major facility for the residence of the mentally retarded.

The defendants have filed a Motion to Dismiss, contending that the Attorney General has no authority or standing to bring this action on behalf of the United States. The states of Pennsylvania and Texas have filed amicus curiae briefs in support of the defendants' position. Plaintiff, of course, sharply disputes the contention that it does not have the authority and standing to prosecute this action.

The issue of executive authority which has thus been joined by this Motion to Dismiss has far-reaching implications for the functioning of a system of constitutional, democratic government based on a balance of powers. See Estelle v. Justice, 426 U.S. 925, 929, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (Rehnquist, J., dissenting from a denial of certiorari). After exhaustive consideration of the relevant arguments and authorities, this Court has reached the emphatic conclusion that the power of the executive branch of government does not extend to bringing a suit such as this one and that defendants' Motion to Dismiss should therefore be granted.

Before detailing the reasons for this conclusion, this Court wants to emphasize that it is expressing no opinion on the merits of the underlying issue regarding the care and treatment of the mentally retarded in Maryland. The proper habilitation of mentally retarded citizens is a matter of acute concern to this Court, as indeed it should be to all decent and civilized persons. This Court has no doubt that the instant lawsuit stems from a benevolent desire on the part of officials of the Department of Justice to improve the lot of the mentally retarded. Important and compelling as a charitable aspiration for helping the mentally retarded achieve a meaningful existence may be, however, it must not be allowed to impel a procedural result which by implication, if not by direct effect, would threaten the delicate balance of power which the Constitution conceives among the various branches of the federal government and between

the federal and state governments. This conclusion does not leave the mentally retarded without remedy for violations of their constitutional rights; it simply means that lawsuits aimed at protecting these rights must be brought by proper plaintiffs. It is noteworthy that several such lawsuits have been brought in recent years in Maryland. *See Maryland Association for Retarded Citizens, Inc. v. Solomon,* Civ. No. N–74–228 (D.Md., filed Mar. 6, 1974); *Maryland Association for Retarded Citizens v. Maryland,* Civ. No. 72–733–M (D.Md., filed July 19, 1972); *Bauer v. Mandel,* Docket 30, Folio 61, File 22871 (Circ.Ct. of Anne Arundel County, filed Sept. 11, 1975); *Maryland Association for Retarded Citizens v. Department of Health & Mental Hygiene,* Docket 100, Folio 182, File 77676 (Circuit Court of Baltimore County, Maryland; decided for plaintiff, May 3, 1974).

This, then, is not in any sense a decision about the rights and needs of the mentally retarded. It is a decision about the proper limitation of the power of the executive branch of the United States Government.

■ Basic to the philosophy of the American Constitution is the notion that the branches of the federal government have no "natural" power, but only such power as is provided by the Constitution itself. *See generally* Hamilton, Madison, and Jay, *The Federalist,* included in Scott, *The Federalist and Other Constitutional Papers* (2 vol. ed. 1894; 1 vol. ed. 1898). So central was this concept in the thinking of the founders of our country that they went to the trouble of making it explicit by means of the ninth and tenth amendments of the Bill of Rights. Thus, the discussion of executive power in this case must start from the premise that the executive branch of the federal government has no power and therefore no legal standing to bring this suit unless such authority can be found, either explicitly or implicitly, in the scheme of government laid out by the Constitution.

■ The Constitution says nothing explicitly about the power of the executive to bring a suit before the judiciary.[1] Despite this, there has never been much question that the Congress, in exercise of its delegated powers (particularly the "necessary and proper" powers of Article I, Section 8), can authorize the executive to sue. *See, e. g., United States v. Raines,* 362 U.S. 17, 27, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Indeed, such legislative authorization abounds.

In the instant case, the government contends that Congress, by means of Sections 516 and 518 of Title 28 of the United States Code, has explicitly authorized the Attorney General to bring this suit. Section 516 is entitled "Conduct of litigation reserved to Department of Justice" and provides as follows:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

Section 518 is entitled "Conduct and argument of cases" and provides in pertinent part as follows:

> When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.

■ These sections, however, do not grant authority to the Attorney General to bring an action concerning any matter in which he thinks that the United States might be "interested." *United States v. Daniel, Urbahn, Seelye and Fuller,* 357 F.Supp. 853, 858 (N.D.Ill.1973); *see Allen v. County School Board of Prince Edward County,* 28 F.R.D. 358, 362–63 (E.D.Va. 1961). The sections tell us nothing about

---

1. It can perhaps be argued that such a power is contemplated, at least in some circumstances, by Article III, Section 2, which extends the judicial power to "controversies to which the United States shall be a Party."

the nature of "interest" which will activate the Attorney General's discretion to act. These sections, therefore, constitute no authority on which to base a conclusion that Congress has explicitly authorized the executive to bring suits generally under the thirteenth and fourteenth amendments.

▮ The Supreme Court long ago made it clear that the executive does have authority to bring suit in some situations even though the Constitution says nothing explicitly concerning such power and even though Congress has not expressly granted such power. The first of such situations recognized by the Court involved the proprietary and contractual interests of the federal government. *Dugan v. United States*, 16 U.S. (3 Wheat.) 172, 4 L.Ed. 362 (1818) (suit on a bill of exchange); *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 8 L.Ed. 66 (1831) (suit for breach of contract); *Cotton v. United States*, 52 U.S. (11 How.) 229, 13 L.Ed. 675 (1850) (suit for trespass). Broadly speaking, the Supreme Court concluded that the power to bring suit was a logical and necessary adjunct to the executive's power to oversee the national government's proprietary and contractual interest. *See also United States v. California*, 332 U.S. 19, 27, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

This limited view of the executive's power to sue was expanded somewhat in *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888), to allow suit to set aside a land patent based on alleged fraud. *Accord, Kern River Co. v. United States*, 257 U.S. 147, 155, 42 S.Ct. 60, 66 L.Ed. 175 (1921). *San Jacinto Tin* seemed to require that the government have some "pecuniary interest in the remedy sought," 125 U.S. at 286, 8 S.Ct. at 857, but such a limitation was apparently abandoned in *United States v. American Bell Telephone Co.*, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888), where a right of action was granted to the executive to protect the government from fraud in the issuance of a patent of invention. The Court in *Bell Telephone* concluded that, despite the lack of any pecuniary interest of the government in re-

scinding the patent, it would be a "strange anomaly" to make the government stand by while "a party may practice an intentional fraud upon the officers of the government who are authorized and whose duty it is to decide upon his right to a patent, and he may by means of that fraud perpetrate a grievous wrong upon the general public." *Id.* at 357, 9 S.Ct. at 93.

This idea of basing the executive's non-statutory power to sue on the notion of a "grievous wrong upon the general public," as opposed to basing it on an invasion of the executive's proprietary, contractual, or pecuniary interest, was brought to full flower in the watershed case of *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). The case involved the question of whether the Attorney General had authority to bring a suit for injunction against activities of union leaders, including conspiracy to use violence to interrupt the mails, during the Pullman strike of 1894. The Supreme Court found that he did. The Court could have rested its decision solely on the executive's proprietary interest in protecting the mails, but Justice Brewer, after citing that basis for suit, went on to conclude the following:

> We do not care to place our decision upon this ground [protecting the mails] alone. Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court. This proposition in some of its relations has heretofore received the sanction of this court. [Whereupon, the Court discussed *San Jacinto Tin* and *Bell Telephone*.] . . .

. . . . . .

It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the constitution are intrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties.

The national government, given by the constitution power to regulate interstate commerce, has by express statute assumed jurisdiction over such commerce when carried upon railroads. It is charged, therefore, with the duty of keeping those highways of interstate commerce free from obstruction, for it has always been recognized as one of the powers and duties of a government to remove obstructions from the highways under its control.

*Id.* at 584–86, 15 S.Ct. at 906–907.

It is not clear from the language of *Debs* just exactly how expansive a meaning the Court intended to attach to the concept of "wrongs . . . such as affect the public at large, and are in respect of matters which by the constitution are intrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights." In decisions subsequent to *Debs*, the Court has applied the concept primarily to situations involving emergency obstructions to interstate commerce. For example, in *Sanitary District of Chicago v. United States*, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925), the Court allowed a suit by the executive for an injunction against reversal of the flow of the Chicago River which threatened the water level of the Great Lakes. *See also Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201–02, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *United States v. Republic Steel Corp.*, 362 U.S. 482, 492, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

Some lower federal courts have determined that the *Debs* holding would have application in situations involving national security. *E. g., United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972); *United States v. Arlington County, Commonwealth of Virginia*, 326 F.2d 929 (4th Cir. 1964); *United States v. New York Times Co.*, 328 F.Supp. 324, 327–28 (S.D.N.Y.1971), *rev'd on other grounds*, 444 F.2d 544 (2d Cir. 1971), *rev'd*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *United States v. Brittain*, 319 F.Supp. 1058, 1061 (N.D.Ala.1970). Such an application might be implied by the Supreme Court's alternate holding in *Sanitary District* that the implementation of treaty obligations would also justify a suit by the executive without legislative authorization. *United States v. City of Glen Cove*, 322 F.Supp. 149 (E.D.N.Y.1971), *aff'd*, 450 F.2d 884 (2d Cir. 1971). However, the Court itself recently avoided an opportunity to decide explicitly whether the *Debs* concept extends to national security matters. *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (the "Pentagon Papers" case); *see also Sullivan v. United States*, 395 U.S. 169, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969); *Paul v. United States*, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). That the executive's constitutional role in protecting national security is arguably much broader than its constitutional role in developing interstate commerce policy may be justification for extending the *Debs* principle into areas of national security, at least when dire emergencies are involved. Be that as it may, it suffices to note that no allegations concerning national security have been made in the instant case.

Despite the susceptibility of *Debs* to the interpretation that the government's nonstatutory right to sue with regard to interstate commerce matters is activated only in

situations involving severe obstructions in the nature of emergency public nuisances, a series of civil rights cases brought by the Attorney General in states of the South in the early 1960's raised the possibility that *Debs* might have a much wider interstate commerce application. *United States v. City of Jackson,* 318 F.2d 1, 11–16 (5th Cir. 1963), *reh. denied,* 320 F.2d 870 (1963) (per curiam); *United States by Katzenbach v. Original Knights of the Ku Klux Klan,* 250 F.Supp. 330, 356 (E.D.La.1965); *United States v. City of Shreveport,* 210 F.Supp. 36 (W.D.La.1962); *United States v. Lassiter,* 203 F.Supp. 20 (W.D.La.1962), *aff'd,* 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962) (per curiam); *United States v. City of Montgomery,* 201 F.Supp. 590 (M.D.Ala.1962); *United States v. U. S. Klans, Knights of Ku Klux Klan, Inc.,* 194 F.Supp. 897, 902 (M.D. Ala.1961). A basic thrust of these cases was that racial discrimination in public accommodations and interference with travel on the basis of race constituted obstructions of interstate commerce which the Attorney General could sue to remove without Congressional authorization. Such "obstructions" could be viewed as less emergent, less tangible, and less direct than the obstructions in *Debs.* So viewed, this line of civil rights cases constitutes an extension of *Debs.* On the other hand, it could be argued that owing to the extremely tense racial situation in the early 1960's, these "obstructions" which the Attorney General was attempting to enjoin constituted no less of an emergency threat to interstate commerce than the violent actions involved in *Debs.* In other words, it would not be illogical to conclude that these civil rights cases did not go beyond a narrow interpretation of the *Debs* concept at all. This conclusion is bolstered by the fact that when the Fifth Circuit panel in *City of Jackson* refused a rehearing, two judges took the opportunity to disavow any support for Judge Wisdom's prior opinion for the court insofar as it had suggested the possibility of broadened nonstatutory right for the executive to sue. These two judges instead concluded that a Congressional enactment had specifically authorized the suit before them. 320 F.2d at 871–73 (Bootle, J. and Ainsworth, J., specially concurring).

Nevertheless, a very broad reading of *Debs* and its civil rights progeny was adopted in the case of *United States v. Brand Jewelers, Inc.,* 318 F.Supp. 1293 (S.D.N.Y. 1970). The Attorney General had brought the suit to halt the scurrilous practice of "sewer service" in New York City. This practice involved the sale by unscrupulous retailers of consumer items on easy credit terms. The sales were quickly followed by lawsuits by the retailers claiming that credit payments had not been made. The retailer would employ private process servers in such suits with the apparent intention that service not actually be made (hence, the name "sewer service," for the alleged practice of the private process servers of simply throwing process papers into the gutter). The idea was to obtain a cheap default judgment with which to garnish the unknowing defendant's salary.

One of the government's arguments in favor of its being able to bring the suit without Congressional authorization in *Brand Jewelers* was that the practice of "sewer service" constituted a substantial burden on interstate commerce due to losses of employment from garnishments, burdens upon employers, and disruptions of labor-management relations. Responding to the defendant's argument that this "burden" was quite different from the obstructive crisis in *Debs,* Judge Frankel concluded that "no plausible reason" existed for attributing any significance to the distinction between physical and nonphysical burdens and between direct and indirect burdens. *Id.* at 1298–99. He cited the civil rights cases and the *Arlington County* decision dealing with national security as authority for this conclusion. His decision, therefore, stands for the notion that chronic, indirect, intangible burdens on interstate commerce are as sufficient to give the federal executive nonstatutory authority to sue as emergent, physical obstructions of the *Debs* or *Sanitary District* variety.

Judge Frankel's expansive application of *Debs* has been roundly criticized. *E. g.,*

Note, *Nonstatutory Executive Authority to Bring Suit,* 85 Harv.L.Rev. 1566 (1972); Recent Decision, *Federal Courts—Standing—United States Has Non-Statutory Authority Under Commerce and Due Process Clauses to Bring Suit to Enjoin "Sewer Service" Practices by Private Business—United States v. Brand Jewelers, Inc.,* 84 Harv.L.Rev. 1930 (1971); Note, *Constitutional Law—United States Government's Standing to Sue—A New Approach to Legal Assistance for Ghetto Residents or an Invitation to Executive Lawmaking?* 17 Wayne L.Rev. 1287 (1971). With all due respect to Judge Frankel, this Court finds itself in agreement with much of the criticism.

■ The extension of the *Debs* principle toward the outer limits of the definition of "burdens" on interstate commerce works a subtle reorganization of the balance of power between the executive and legislative branches of the federal government. Congress has been specifically entrusted with primary responsibility for the regulation of interstate commerce. U.S.Const. art. I, § 8, cl. 3. It is one thing to give the executive an independent role when there is an emergency threat to interstate commerce to which only the executive branch of government has the capacity to respond with appropriate alacrity, but it is quite another thing to give the executive an independent role where the "emergency" is debatable and all that may be at stake is the development of policy concerning interstate commerce. The commerce clause clearly anticipates that policy development is to be left to Congress.

It is no answer to this analysis of the structure of our government to suggest, as Judge Frankel did (see *Brand Jewelers, supra* at 1299), that the power to sue is not really an independent power because it is, after all, subject to the check and balance of the judiciary which adjudicates the merits of any suit. Lawsuits, especially ones brought by the federal government, unquestionably have an impact that transcends any adjudication which may occur. Settlement, particularly where it involves

pure capitulation by the defendant, can result in a de facto policy which has never been subject to the check of final adjudication. More important, though, the wisdom of a judge, even if he gets a chance to exercise it, is no substitute in our system of representative government for the political process of the legislature in areas of important policy development such as interstate commerce.

It is also no answer to the balance-of-powers problem to presume, see *id.,* that the legislature can and will correct any result with which it does not concur. The policy effected by the lawsuit may be irreversible, or at least the reversal may prove more troublesome than the effort is worth. Action by Congress is usually time-consuming and quite arduous. To place a burden of response on the legislative process would undoubtedly result in the development of ambiguous policy situations in which, for whatever reasons, the legislature has been unable to grind out either an explicit approval or disapproval of the policy brought into being by an executive lawsuit.

Perhaps the strongest reason against allowing the nonstatutory authority of the executive to sue to extend to the broadest reaches of interstate commerce is the impact such power has on our system of federalism. Difficult indeed is the task of anyone who tries to demonstrate in this day and age that any action, especially a state program or policy, has no effect on interstate commerce. Thus, if the executive nonstatutory power to sue to protect interstate commerce is given its broadest application, no state policy or program will be safe from the questioning eyes of those few lawyer-bureaucrats who have the authority to devise government lawsuits. Such an affront to the federal system of shared powers should not be countenanced unless absolutely necessary. *Cf. Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).

Of course, this Court is fully cognizant of the fact that the Supreme Court has allowed the powers of Congress itself to reach into the farthest and darkest nooks

and crannies of man's conception of "interstate commerce." *E. g., Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). This, too, can lead to serious debasement of the principle of federalism. *See, e. g., Maryland v. Wirtz,* 269 F.Supp. 826, 852–55 (D.Md.1967) (Northrop, J., dissenting), *aff'd,* 392 U.S. 183, 201–05, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (Douglas, J., dissenting). The Supreme Court, however, is now demonstrating a greater concern for Congressional assaults on federalism through the Commerce Clause. *The National League of Cities v. Usery,* —— U.S. ——, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (which expressly overruled *Maryland v. Wirtz*). In any event, it can at least be said that Congressional impingement on state policy-making sovereignty is quite different from executive intrusion. The members of Congress are drawn from and maintain close ties with their respective states; thus, Congress cannot act without the states in a sense having some say in the matter. The same cannot be said when the executive branch of the federal government acts alone. It must also be noted that the legislative process is by its very nature less given to the influence of the whims and fancy of just one or two individuals. In short, troubling though the encroachment of Congress through the Commerce Clause on the integrity of state sovereignty may be, allowing the executive to exercise independent powers of encroachment would be far more troubling.

■ Having said all of this, this Court hastens to recognize that the government in the instant case is not claiming that its power to sue stems from a burden on interstate commerce. The foregoing analysis is not in vain, however, for the same considerations which militate against extending *Debs* to the limits of the notion of burdens on interstate commerce also dictate against acceptance of the government's argument in this case that the *Debs* principle should be extended beyond interstate commerce into the area of thirteenth or fourteenth amendment enforcement.

Apparent authority for the government's position is found in *Brand Jewelers.* Judge Frankel not only extended the *Debs* principle as it applies to obstruction of commerce, but he alternatively held that the executive has a nonstatutory right to sue under the fourteenth amendment irrespective of any burdens on interstate commerce. In reaching this conclusion, the judge chose not to follow several courts which had determined that the Attorney General has no such sweeping power. *United States v. County School Board, Prince George County, Virginia,* 221 F.Supp. 93, 103–04 (E.D.Va.1963) (dictum); *United States v. Biloxi Municipal School District,* 219 F.Supp. 691, 693–94 (S.D.Miss.1963) and *United States v. Madison County Board of Education,* 219 F.Supp. 60, 61 (N.D.Ala.1963), *both aff'd on other grounds,* 326 F.2d 237 (5th Cir. 1964), *cert. denied,* 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964). Instead, he relied on the more tenuous authority represented by Judge Wisdom's opinion in *City of Jackson, supra,* which, as previously pointed out, was rejected by the other two judges insofar as it suggested (and, indeed, it had only "suggested" without indicating total acceptance) application of the principles on which Judge Frankel wished to rely, and on a dissent in *United States v. Mississippi,* 229 F.Supp. 925, 976 (S.D.Miss.1964) (Brown, J., dissenting), *rev'd,* 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) which relied entirely on Judge Wisdom's opinion.

Realizing that his holding was breaking new ground in the application of *Debs,* Judge Frankel offered the following justification for the expansion:

[T]his court finds no acceptable basis in principle for distinguishing today the authority of the Attorney General to protect against large-scale burdens on interstate commerce from his authority to protect against large-scale denials of due process. The dramatic history of how great judges participated in the building of a nation by imaginative unfolding of the commerce power needs no retelling here. Nor is it necessary now to be portentous about the new struggles for individual rights and decency that may be

vital for the preservation of what our predecessors built. It seems sufficient for present purposes to say that there appears to be no pertinent constitutional difference between the national power to regulate commerce and the prohibition in the Fourteenth Amendment which the United States seeks in this suit to enforce.

*United States v. Brand Jewelers, supra* at 1300; *see also Alexander v. Hall,* 64 F.R.D. 152, 157 (D.S.C.1974) (allowing government intervention in a suit challenging state commitment and detainment procedures for the mentally ill).

This Court respectfully declines to follow this "imaginative unfolding" of the *Debs* principle into the area of fourteenth amendment enforcement.

■ Just as nonstatutory executive power to sue based on a broad notion of burdens on interstate commerce insinuates the federal legal bureaucracy into practically every conceivable affair of state policy-making, thereby destroying federalism, so too does a power to sue based on notions of deprivation of thirteenth and fourteenth amendment rights. Such a blow to federalism might arguably be justified if absolutely no other adequate protection for fourteenth amendment rights were available. This "absolute necessity" factor was perhaps a key in the application of the *Debs* principle in the civil rights cases of the early 1960's, for the pervasive racial discrimination which was in issue in those cases also worked as a mighty deterrent to any kind of effective court action by the aggrieved individuals themselves. No such "absolute necessity" obtains in the instant case. As evidenced by the suits which are presently pending in this court and in the state courts, the mentally retarded are certainly not without adequate resources for the protection of their civil rights.[2] *See*

*Maryland Association for Retarded Citizens, Inc. v. Solomon, supra; Maryland Association for Retarded Citizens, Inc. v. Maryland, supra; Bauer v. Mandel, supra; and Maryland Association for Retarded Citizens v. Department of Health & Mental Hygiene, supra.*

■ As with interstate commerce, policy-making in the area of enforcement of the thirteenth and fourteenth amendments is primarily entrusted to Congress. U.S. Const., Amend. 13, § 2; Amend. 14, § 5. Thus, any extension of independent authority to the executive in enforcing the thirteenth and fourteenth amendments is fraught with potential for undoing the balance of powers between the branches of the government. With regard to this balance of power, it is extremely significant to note that the *Debs* extension of independent nonstatutory authority to the executive took place in the context of Congress not having expressed any opinion as to whether the executive should have such new power. *Debs*, and its predecessors and progeny, could in fact be read as finding that the nonstatutory authority of the executive to sue extends only to situations in which it can be surmised that Congress wants the executive to sue. The instant case reveals a quite different picture of the will of Congress.

Pursuant to its power to regulate interstate commerce and to enforce, by appropriate legislation, the provisions of the thirteenth, fourteenth, and fifteenth amendments, Congress has enacted numerous enforcement schemes involving the Attorney General. *See, e. g.,* 18 U.S.C. § 242; 42 U.S.C. §§ 1971, 1973, 1974, 2000a–5, 2000b, 2000c–6, 2000e–6, 2000h–2, 2000h–3. None of these authorizations covers the situation in the instant case. It could therefore be argued that Congress intended that the ex-

---

2. Of course, concerns about federalism can also play a significant role in civil rights suits brought by individuals, particularly where the remedy sought involves the creation of new state programs, *Rizzo v. Goode, supra,* or a major continuing intrusion of the Federal courts into the daily conduct of state affairs.

*O'Shea v. Littleton,* 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). It would be premature to speculate at this point what the effect of such concerns might be in a suit brought by individuals which contains the type of allegations and requests for remedies present in the instant suit.

ecutive not sue in a case like the instant one.

■ To counter this inference, the government contends, first of all, that Congress' various specific authorizations for suit by the Attorney General constitute merely "legislative direction" for the exercise of the sweeping power which Congress otherwise generally intends the Attorney General to have in thirteenth and fourteenth amendment cases. In other words, the specific authorizations are actually diminutions of the power Congress otherwise wants the executive to have. It can hardly be believed, however, that Congress would go to so much effort just to give "direction." *United States v. School District of Ferndale, Michigan,,* 400 F.Supp. 1122, 1130 (E.D.Mich.1975). In any event, as will be demonstrated *infra,* the tenor, as well as the substance, of the Congressional debates and reports regarding the various civil rights acts belies any such notion.

The government also points out that Congress has passed much legislation evidencing concern for the mentally retarded. Although, like the civil rights legislation, none of the mental retardation legislation provides explicit authority for the instant suit, the government contends that the two types of legislation taken together impliedly sanction a suit like the instant one.

This Court recognizes that it is proper to infer in some situations that Congress tacitly intended a more wide-reaching scheme for the accomplishment of its goals than it was able to articulate. *Wyandotte, etc. v. United States, supra; United States v. Republic Steel Corp., supra.* This, however, is not an appropriate case for such an inference.

■ First, in one of the enactments cited by the government, the Developmentally Disabled Assistance and Bill of Rights Act (the "Act"),[3] Congress has provided a

---

3. 42 U.S.C. § 6001 *et seq.* This legislation pulls together and embellishes several prior enactments aimed at developing a meaningful federal program for assisting the states and private agencies in improving habilitative services for the mentally retarded and other developmentally disabled persons. The background of the legislation is succinctly presented in the following excerpt from the legislative history:

> Developmental disabilities are disabilities, such as mental retardation, cerebral palsy, epilepsy, autism, dyslexia and neurological conditions, which originate in childhood, continue indefinitely, and constitute a substantial handicap to the affected individual. There are over 6 million people in the United States suffering from mental retardation and, depending on who is counted, an additional several million people suffering from other developmental disabilities. Citizens with developmental disabilities need support and assistance with learning and living so that they may function in our society as the citizens that they are with maximum effectiveness.
>
> The Congress of the United States began to respond to the needs of these millions of people many years ago with an assortment of social security and rehabilitation programs. This response received new impetus in 1963 with the enactment of the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963 (Public Law 88–164, October 31, 1963). This Act provided for centers for research on the mentally retarded, construction of university affiliated facilities for the mentally retarded,

> construction of other facilities for the mentally retarded, and training of teachers of mentally retarded and other handicapped children.
>
> The legislation was continued with modest revisions by the Mental Retardation Amendments of 1967 (Public Law 90–170). This Act extended the authority for grants for the construction of facilities for the mentally retarded and university-affiliated facilities through June, 1970, added authority for grants for the costs of the professional and technical personnel of community mental retardation facilities, added authority for the training of physical educators and recreation personnel for such facilities, and broadened the definition of mental retardation to include neurological handicaps related to it.
>
> The Act was subsequently rewritten in 1970 by the Developmental Disabilities Services and Facilities Construction Amendments (Public Law 91–517). This Act changed the title of the program and its direction to a broader and more inclusive concern for the developmentally disabled generally. It authorized formula grants to states for planning, administration, construction, and services concerned with developmental disabilities, grants for interdisciplinary training programs in institutions of higher learning, grants for special projects of national significance, grants for the construction and operation of university-affiliated facilities for those with developmental disabilities, and provided for the establishment of a National Advisory

scheme whereby the executive branch of government can accomplish much of what the Attorney General hopes to accomplish in this suit. Under this Act, in order for a state to receive federal funds for construction of new facilities and provision of new services for the mentally retarded, it must agree to abide by qualitative standards for habilitative care prescribed in regulations promulgated by the Secretary of Health, Education & Welfare. 42 U.S.C. §§ 6008, 6063. A state's funds may be discontinued (after notice and opportunity for hearing) if the Secretary finds that the standards prescribed by the regulations are no longer being met. 42 U.S.C. § 6065. Thus, Congress has devised what it hopes will be an effective carrot-and-stick method of improving the lot of the mentally retarded in America.[4] This Court simply cannot believe that Congress intended or expected that while an elaborate plan to improve the lot of the mentally retarded was being implemented by the one federal agency (the Department of Health, Education & Welfare) with expertise in the field of mental retardation, another government agency (the Department of Justice) with no expertise in the solution of the very difficult problems posed by mental retardation would simultaneously be making wholesale attacks on a state's mental retardation programs under the guise of protecting thirteenth and fourteenth amendment rights. Surely, if Congress had wanted two agencies to be involved in ameliorating the states' efforts to

help the mentally retarded, it would have at least provided some legislative guidance as to procedures for preventing the conflict and contradictory goals that can and do occur when two federal agencies independently act on the same matter.

■ An even stronger reason for not inferring from the various Congressional enactments aimed at helping the mentally retarded and protecting civil rights that Congress tacitly sanctions a broad authority to sue for the Attorney General is that Congress has several times explicitly considered and rejected the idea of broadening the Attorney General's powers to sue to protect citizens' rights under the thirteenth and fourteenth amendments.

The bill passed by the House of Representatives which ultimately became the Civil Rights Act of 1957 included a section, Title III,[5] giving the Attorney General broad powers to seek civil remedies in civil rights cases involving violations of 42 U.S.C. § 1985. The inclusion of Title III was apparently in response to the then Attorney General's request that he be given the expanded powers. *See* Letter of Attorney General Herbert Brownell, H.R.Rep.No. 291, 85th Cong., 1st Sess. (1957), 1957 U.S. Code Cong. & Admin.News, pp. 1979–80. After vehement opposition to Title III on the floor of the Senate—opposition based in significant part on the effect such broad power might have on the balance of powers between the federal and state governments,

---

Council on Services and Facilities for the Mentally Disabled. H.R.Report No. 94–58, 94th Cong., 1st Sess. (1975), 1975 U.S.Code Cong. & Admin.News, pp. 921–22.

**4.** A similar carrot-and-stick approach to improving services by the states is present in other enactments which affect the mentally retarded. *See, esp.,* 42 U.S.C. §§ 1395–96 ("Medicaid"). Maryland receives substantial amounts of funds under the Medicaid program for care of persons at Rosewood Hospital. Plaintiff's Brief, Addendum B. Significantly, as revealed at the hearing on the Motion to Dismiss, Maryland is at this very moment engaged in an effort to ensure that its programs at Rosewood meet the rigorous requirements of the Medicaid program. See also 42 U.S.C. § 1397.

**5.** Title III read in pertinent part as follows:
Section 121, Section 1980 of the Revised Statutes (42 U.S.C. 1985) is amended . . . to read as follows: "Fourth. Whenever any persons have engaged or there are reasonable grounds to believe that any persons are about to engage in any acts or practices which would give rise to a cause of action pursuant to paragraphs 1st, 2nd, or 3rd, the Attorney-General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. . . ."

see 103 Cong.Rec. 12530–12565 (daily ed. July 24, 1957)—it was deleted from the Senate version of the bill, and the Civil Rights Act of 1957 was subsequently enacted without it.

An attempt to rejuvenate Title III in the Civil Rights Act of 1960 was also rejected. See H.R.Rep.No.956, 86th Cong., 2d Sess. (1960), 1960 U.S.Code Cong. & Admin.News, p. 1940; 106 Cong.Rec. 5151–5182 (daily ed. Mar. 10, 1960).

The Civil Rights Act of 1964 greatly broadened the Attorney General's power to bring suits, but the House explicitly rejected in committee an attempt to incorporate broad, Title III-type powers for the Attorney General. See H.R.Rep.No.914, 88th Cong., 2d Sess. (1964), 1964 U.S.Code Cong. & Admin.News, pp. 2392–93, 2411.[6] Perhaps a significant factor in the House's rejection of the notion of expanding the Attorney General's power to bring suit to the ultimate limits allowed by the thirteenth and fourteenth amendments was the caution of then Attorney General Robert F. Kennedy, who made the following remarks to the Committee on the Judiciary:

> Title III would extend to claimed violations of constitutional rights in State criminal proceedings or in book or movie censorship; disputes involving church-state relations; economic questions such as allegedly confiscatory ratemaking or the constitutional requirement of just compensation in land acquisition cases; the propriety of incarceration in mental hospital; searches and seizures; and controversies involving freedom of worship, or speech, or of the press.
>
> Obviously, *the proposal injects Federal executive authority into some areas which are not its legitimate concern* and vests the Attorney General with broad discretion in matters of great political and social concern.

> . . . Which types of disputes should the Attorney General make a matter of Federal concern? . . .

*Id.* at 2450 (emphasis added).

Thus, since Congress has explicitly considered and rejected extending the authority of the Attorney General to sue generally in cases such as the instant one, the inference is strong that Congress feels the Attorney General should not have a power to sue broader than that it has specifically given.

The government attempts to overcome Congress' rejection of broader powers to sue by asserting that the authority to sue can be inferred even where Congress has explicitly considered and rejected such authority. The government cites as authority for this proposition the case of *United States v. California*, 332 U.S. 19, 27–28, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), in which the government's authority to sue to void leases improperly granted by California for oil exploration in offshore lands owned by the federal government was upheld in the face of two prior failures of Congress to grant such power to sue. A significant aspect of the Supreme Court's decision, however, was the explanation in a footnote that Congress had failed to grant such power to sue because it felt that the executive already had such power in the situation involved. *Id.* at 28 n. 4, 67 S.Ct. 1658. In the instant case, on the other hand, Congress has failed to grant the power to sue, not because it feels the executive already has such power, but because it apparently doubts whether the executive should have such power. *United States v. California* therefore does not constitute authority for allowing suit by the executive in this case.

■ When the apparent will of Congress is that the executive should not have a power, the burden of the executive to show that it should nevertheless have the power is an extremely heavy one, "for what

---

**6.** The bill passed by Congress did provide broad power for the Attorney General to intervene in fourteenth amendment cases. 42 U.S.C. § 2000h–2. It is unnecessary at this time to decide whether this intervention authorization might justify a different line of analysis in a case where the government seeks authority to intervene in a situation outside the boundaries of this specific authorization. Consider, e. g., *In re Estelle*, 516 F.2d 480 (5th Cir. 1975), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976); *Alexander v. Hall, supra.*

is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co., Inc. v. Sawyer*, 343 U.S. 579, 637–38, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (the *"Steel Seizure"* case). When the independent authority (or, as plaintiff terms it, the "inherent power") is sought to be exercised in an area of concern, such as national security, where the executive's Constitutional role is equal, if not superior, to that of Congress, the executive's burden may be eased somewhat. But when the independent executive authority is sought to be exercised in an area of concern, such as the protection of fourteenth amendment rights or the development of interstate commerce policy, where the role of Congress is predominant under the Constitution, the executive's burden of showing the need for an independent authority to act is most severe.

■ That severe burden is not sustained in the instant case by the government's incantation of the Constitution's charge to the executive that it "take Care that the Laws be faithfully executed." Art. II, § 3. While this duty may provide a basis for independent action in certain very limited situations where Congress has not taken a position concerning such action, *see, e. g., In re Neagle*, 135 U.S. 1, 63–66, 10 S.Ct. 658, 34 L.Ed. 55 (1890), in general it is subject to the wise circumscription expressed by Justice Frankfurter in the *Steel Seizure* case:

> Apart from his vast share of responsibility for the conduct of our foreign relations, the embracing function of the President is that "he shall take Care that the Laws be faithfully executed * * *." Art. II, § 3. The nature of that authority has for me been comprehensively indicated by Mr. Justice Holmes. "The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." *Myers v. United States*, 272 U.S. 52, 177, 47 S.Ct. 21, 85, 71 L.Ed. 160. The powers of the President are not as particularized as are those of Congress. But unenumerated powers do

not mean undefined powers. The separation of powers built into our Constitution gives essential content to undefined provisions in the frame of our government. *Youngstown Sheet & Tube Co., Inc. v. Sawyer, supra*, 343 U.S. at 610, 72 S.Ct. at 897 (Frankfurter, J., concurring).

■ In this case, the executive has not shown to exist with regard to the protection of the rights of the mentally retarded citizens of Maryland, anything approaching a situation of national emergency, the appropriate response to which can only be made independently by the executive branch of the federal government. Thus, this Court concludes that the executive's severe burden to justify independent action in the face of Congressional disapproval of such action has not been met, and the federal executive therefore lacks standing to bring the instant action.

Accordingly, IT IS, this 8th day of July, 1976, by the United States District Court for the District of Maryland, ORDERED:

1. That defendants' Motion to Dismiss this action BE, and the same hereby IS, GRANTED; and

2. That the within case BE, and the same hereby IS, DISMISSED.