CELEBREZZE, Circuit Judge.
The School District of the City of Fern-dale, Michigan, covers a small suburban area immediately north of Detroit. Approximately fifty years ago, the local school board ordered construction of the U. S. Grant elementary school in the southwest corner of the district. The attendance area for Grant was carved out of that for the Thomas Jefferson elementary school, an institution with a predominantly white student body located approximately one-half mile from the Grant school site. The first class of students at Grant was entirely black, save for one student.
There is little dispute that, at least until 1975, Grant remained overwhelmingly black. Between 1968 and 1974, no white students attended Grant. During the same period the Grant faculty was predominantly and sometimes entirely black. Of the other nine elementary schools in the district, all have overwhelmingly white student and faculty populations. In the 1974-75 school year, for example, only fifteen of the district’s 277 black elementary students attended schools other than Grant. The total elementary student population that year was 3527. Jefferson school had only one black student in each year between 1971 and 1975, out of an average enrollment of 350. During the same period, black teach *1342 ers constituted over 85% of the faculty at Grant, while only about 12% of the faculty district-wide.[1]
In 1969, the United States Department of Health, Education and Welfare (HEW) instituted administrative proceedings against the school district under Title VI of the Civil Rights Act of 1964. That statute permits federal agencies to cut off financial assistance to state programs that subject persons to racial discrimination. 42 U.S.C. §§ 2000d, 2000d-l. After extensive hearings, an HEW hearing examiner ordered termination of all HEW aid to the school district, based on the following findings:
The Examiner rejects the contentions of the School Board that the Grant School was innocently established and innocently maintained as a “neighborhood” school; that its student body is and was all black because the residential area in which the school was established was and is all black and the School District did not create this residential pattern. The weight of the evidence requires the findings (Findings of Fact below) that the School Board established the Grant School as a separate school for Negro children for the purpose of segregating the Negro children in the Grant area from the white children in its elementary schools; that it continued to maintain the school with an all-black student body for that purpose: and that it assigned a segregated all-black teaching faculty to the school for many years in accordance with a purpose to discriminate against the black children in the Grant area; that the School Board’s course of conduct for forty-four years has been consistently one of segregating the Negro children residing in the Grant area and the Township, from the Ferndale City elementary schools.
Further, it must be found that the course of conduct of the School Board was consistent with the pattern of private discrimination and adjuvant public action, that created and maintained racially separate black and white residential neighborhoods, and that the residential segregation and the school segregation each supported the other.
On the basis of the foregoing, the Hearing Examiner finds that the Grant School is and was a de jure segregated school. The school is maintained in violation of the Civil Rights Act of 1964, supra. (footnote omitted) (filed 9/28/70).
This fund termination order was affirmed by a Reviewing Authority at HEW, and a petition for review was subsequently denied by the Secretary of HEW. On March 1, 1973, this Court affirmed the fund termination order, finding that it was supported by substantial evidence. School Dist. of City of Ferndale v. H. E. W., 474 F.2d 1349 (6th Cir.) (unpublished order), cert. den., 414 U.S. 824, 94 S.Ct. 126, 38 L.Ed.2d 57 (1973).
After the cutoff of federal funds, Fern-dale school officials instituted two educational programs at Grant school for 1975-76 and 1976-77 schools years: 1) A traditional academic program for Grant students in grades kindergarten through six; 2) An “open classroom” program for other students in grades kindergarten through six. The open classroom approach differs from the traditional program in that it is less structured, and allows for more individualized treatment of students. The program was open to all elementary students in the district on a voluntary basis. In addition to the changes at Grant, the school district implemented an “open enrollment” or freedom of choice plan under which black students residing in the Grant attendance area were provided the choice of attending any other elementary school in the Ferndale school district.
These programs produced the following attendance figures for the 1975-76 school year.[2]
*1343 Grant School
Traditional Program Open Classroom
230 black (approx) 31 black
_0 white 169 white
230 total 200 total
The two programs at Grant, while housed in the same building, were conducted in separate classrooms. Only seven black students in the Grant attendance area elected the freedom of choice option for the 1975-76 school year.
Projected faculty composition at Grant for the 1975-76 school year was as follows:
Traditional Program Open Classroom
Teachers: Teachers:
7 black 0 black
3_white 7J> white
10 total 7.5 total
The school district projected a total of eight teachers in the traditional program for 1976-77: four black and four white.
In the spring of 1975, the United States filed a desegregation suit against the Pern-dale School District under the Equal Educational Opportunities Act of 1974 (EEOA or the Act), 20 U.S.C. §§ 1701-1758. The complaint alleged, inter alia, that the Grant school had been illegally maintained as a racially segregated institution. Approximately one year later, the United States filed a second desegregation suit based on similar allegations, but this time under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6. Both of these actions are now before this Court on interlocutory appeals filed by the United States. Because the cases involve a common factual basis, we have consolidated them for purposes of review.
I. EEOA SUIT
The EEOA action was brought under a provision of the Act that permits the Attorney General to institute a civil action in the name of the United States on behalf of individuals denied “equal educational opportunity” as defined in the Act. 20 U.S.C. § 1706. Under that definition, an educational agency is prohibited from deliberately segregating students on the basis of race or failing to take affirmative steps to eliminate the vestiges of a dual school system. 20 U.S.C. §§ 1703(a) and (b). The Act also generally prohibits racial discrimination in the employment or assignment of faculty or staff. 20 U.S.C. § 1703(d).
The Attorney General’s complaint named as defendants the School District of the City of Ferndale, members of the Ferndale Board of Education, and the Superintendent of the school district (local defendants). Also named as defendants were the State of Michigan, the Governor of Michigan, the Michigan State Board of Education, and the Michigan Superintendent of Public Instruction (State defendants).[3]
The proceedings in the District Court have been fully reported, and need not be recited here. United States v. School District of Ferndale, 400 F.Supp. 1122 & 1131 & 1135 & 1141 (E.D.Mich.1975) (4 opinions). Suffice it to say that the District Court dismissed the EEOA claims on various grounds, and simultaneously denied a motion for summary judgment by the United States.[4] The District Court has certified these rulings for interlocutory appeal under 28 U.S.C. § 1292(b).
A. Dismissal of EEOA Allegations for Failure to Specify Individuals Represented
The first ruling appealed is the dismissal of the EEOA allegations in the complaint[5] for failure to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 12(b)(6). The District Court held that the complaint did not comply with the following EEOA provision:
*1344 An individual denied an equal educational opportunity, as defined by this sub-chapter may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate. The Attorney General of the United States (hereinafter in this chapter referred to as the “Attorney General”), for or in the name of the United States, may also institute such a civil action on behalf of such an individual.
20 U.S.C. § 1706 (emphasis supplied). In particular, the Court ruled that the complaint did not adequately identify those persons “on whose behalf” the action was being brought by the Attorney General. Although the actual naming of individuals was not required, the Court felt that the statute demanded at least enough specificity to make it “ ‘administratively feasible for the court to determine whether a particular individual’ ” was a member of the group being represented. 400 F.Supp. at 1128, quoting 7 Wright & Miller, Federal Prac. & Proced. § 1760 at 581.
The relevant allegations in the complaint read as follows:
COUNT ONE
8. As a first claim, this action is brought by the Attorney General, pursuant to 20 U.S.C. § 1706 and the Fourteenth Amendment, for and in the name of the United States, on behalf of the black students in attendance at the public elementary schools of the defendant school district, the black faculty and staff members assigned to the public elementary schools of the defendant school district, and other black persons in the defendant school district similarly situated who are being denied, and will continue to be denied, an equal educational opportunity and the equal protection of the laws as set out below.
9. The defendant school district and local school officials built, and have continued to operate and maintain the U. S. Grant Elementary School in the School District of the City of Ferndale, for the purpose and with the effect of segregating black elementary students in the school system and have discriminatorily assigned black faculty and staff to the Grant school on the basis of race.
The District Court concluded that these allegations failed to sufficiently identify the persons on whose behalf the action was being brought. Specifically, the Court held that it was unable to discern from the complaint whether the following persons were being represented by the Attorney General:
1) Black elementary school students who live outside the Grant School attendance zone, all of whom apparently attend predominately white elementary schools;
2) Black elementary students living in the Grant attendance zone who have elected or will elect to attend another school under the “open enrollment” plan of the school district; and
3) Students who live in the Grant School attendance zone who are enrolled in the school district’s “open classroom” program, to begin in the fall of 1975.
400 F.Supp. at 1134 (footnote omitted).
Upon review of the complaint we think it is abundantly clear “on whose behalf” the suit is brought. The complaint expressly identifies “the black students in attendance at the public elementary schools of the defendant school district” as individuals represented.[6] It alleges that those students have been denied equal educational opportunity by virtue of the school district’s operation and maintenance of Grant school as a racially segregated institution. The averments leave little question as to what the United States is complaining about and whose rights it is attempting to vindicate. See United States v. Greenwood Municipal School Dist., 406 F.2d 1086, 1090 (5th Cir.), cert. den., 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969).
*1345 As to the three groups of students about whom the District Court expressed concern, we think a reasonable reading of the complaint would include all of them in the group represented by the Attorney General. All are “black students in attendance at the public elementary schools of the defendant school district.” See complaint par. 8, supra. The fact that all are now attending programs that are integrated to some degree does not prevent assertion that they are being denied equal educational opportunity.[7]
In any event, we find nothing in the EEOA that requires the specificity of allegation required by the District Court. The statute permits the Attorney General to bring an action “on behalf of an individual denied equal educational opportunity”; it does not require identification of all actual or potential victims of such denials. As long as there is at least one person arguably denied equal educational opportunity, the statutory requirement is met.[8] We see no reason to read into the statute a pleading rule not specified by Congress that can only have the effect of impeding enforcement of the Act.[9] Such a construction would also be inconsistent with Federal Rule of Civil Procedure 8, which requires “simple, concise, and direct” averments, and which mandates that pleadings “be so construed as to do substantial justice.”
Accordingly, the judgment of the District Court dismissing the EEOA allegations is reversed.
B. Dismissal of Fourteenth Amendment Allegations
In the EEOA complaint, the United States alleged that the defendants’ conduct violated the fourteenth amendment as well as the EEOA.[10] The District Court dismissed the fourteenth amendment allegations, holding that the Government did not have standing to assert them: its authority to sue in this case derived solely from § 207 of the EEOA, which applies only to denials of “equal educational opportunity” as defined in the statute. 400 F.Supp. at 1129-30. The United States argues on appeal that the EEOA effectively incorporates the fourteenth amendment by reference, and that to exclude the constitutional allegations would create needless confusion in desegregation litigation.[11]
We agree with the District Court that a desegregation suit brought by the Attorney General solely under the authority of the EEOA may not include fourteenth amendment claims. Prior to enactment of the EEOA, Congress had already provided a method for the Attorney General to assert equal protection violations in school desegregation cases. Under Title IV, § 407, of the Civil Rights Act of 1964, the Attorney General may bring such an action only after receiving a signed complaint from a parent or parents, and only after determining 1) that the complaint is meritorious, 2) that the signer(s) of the complaint is unable to initiate and maintain appropriate legal pro *1346 ceedings for relief, and 3) that institution of an action will materially further the orderly achievement of desegregation in public education. 42 U.S.C. § 2000c-6. The construction urged by the United States would allow the Attorney General to circumvent all of these requirements simply by filing suit under the EEOA instead of Title IV. There is no language in the EEOA suggesting that Congress intended such an implied repeal of the § 407 procedures. Quite to the contrary, the EEOA implicitly limits actions by the Attorney General to cases involving a denial of “equal educational opportunity, as defined” in the EEOA, 20 U.S.C. § 1706 (emphasis supplied).[12]
Of course, the EEOA definition of a “denial of equal educational opportunity,” is quite broad:
No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
(a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;
(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system;
(c) the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;
(d) discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff, except to fulfill the purposes of subsection (f) below;
(e) the transfer by an educational agency, whether voluntary or otherwise, of a student from one school to another if the purpose and effect of such transfer is to increase segregation of students on the basis of race, color, or national origin among the schools of such agency; or
(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.
20 U.S.C. § 1703.
There is unquestionably considerable overlap between these protections, and those provided under the fourteenth amendment. The statute does not expressly incorporate the amendment, however, and we are not prepared to say that the two provisions are coextensive. At least one circuit has ruled that the EEOA actually goes beyond the acts and practices proscribed by the fourteenth amendment and guarantees additional rights to public school children. United States v. Hinds Co. School Bd., 560 F.2d 619, 623-24 (5th Cir. 1977). In this light, we think it best to defer interpretation of any particular EEOA provision until the meaning of that provision is at issue in a case before us.
The judgment of the District Court dismissing the fourteenth amendment allegations in the EEOA complaint is affirmed.
C. Dismissal of State Defendants.
The Government’s complaint includes the following allegations relevant to the State defendants:
12. Since the initiation of administrative proceedings by HEW in 1969, the State defendants have known that the *1347 Ferndale elementary schools were being operated by the defendants local school authorities on a racially segregated and discriminatory basis.
13. The State defendants, notwithstanding their knowledge that the Fern-dale elementary schools were being operated by defendant local school authorities on a racially segregated and discriminatory basis, have nevertheless continued to aid and assist the perpetuation and maintenance of that racial segregation and discrimination through the provisions of state funds and other assistance, while failing and refusing to take any necessary or appropriate action to bring the operation of the Ferndale elementary schools into compliance with the Fourteenth Amendment to the United States Constitution.
14. The defendants continue to operate, permit, aid, and assist the operation of the elementary schools in the defendant school district on a racially segregated and discriminatory basis.
* * * * * *
18. The actions and inactions of the defendants, as described in paragraphs 9 and 12 through 17 above, deny equal protection of the laws and equal educational opportunity to black students and black faculty and staff in the elementary schools in Ferndale in violation of 20 U.S.C. § 1703(a), (b) and (d) and the Fourteenth Amendment to the Constitution of the United States.
Shortly after the United States filed these allegations, the State defendants filed a motion to dismiss the EEOA claims against them for failure to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion holding that the acts allegedly committed by the State defendants, even if proven, would not constitute violation of the following EEOA proscriptions relied on by the United States:
No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
(a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;
(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system;
* * * * * *
(d) discrimination by an educational agency on the basis, of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff, except to fulfill the purposes of subsection (f) below;
20 U.S.C. § 1703.
The District Court ruled that the State could not be held culpable under these provisions because it was not the “educational agency”[13] that allegedly committed the proscribed discriminatory acts. 400 F.Supp. at 1138. The gravamen of the complaint against the State defendants is not that they directly engaged in discriminatory assignment of students and teachers, but that they tolerated and provided assistance to a local school district which they knew to be engaging in such practices. The District Court apparently felt that the statute applied only to direct acts of discrimination, not to indirect assistance to districts violating the Act.
We do not believe that the State can escape liability under the Act merely because its support for the proscribed actions was indirect.[14] - This Court has previously noted the substantial control exerted by Michigan state officials over local school operations. Bradley v. Milliken, 484 F.2d 215, 238-41 (6th Cir. 1973) (en banc), rev’d *1348 on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In another Michigan desegregation case, we expressly ruled that state officials could be held jointly responsible with local authorities for segregated conditions in local schools, where the state officials had shown “consistent inaction in preventing increased segregation” and had consistently provided funding and other assistance to the local district. Oliver v. Michigan State Bd. of Ed., 508 F.2d 178, 186-87 (6th Cir. 1974), cert. den., 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). Although that claim arose under the fourteenth amendment, we think the principle of joint liability is applicable here as well. Congress plainly intended that the practices listed in § 1703 be ended. Such a goal can only be subverted by allowing states to knowingly support the prohibited practices with impunity. This is particularly true where state assistance forms a sizable part of the local school district’s budget.[15] We seriously doubt that Congress intended to allow states to bankroll dual school systems, while enacting a statute specifying remedies for the elimination of such systems. See 20 U.S.C. § 1702(b).
We note also that the EEOA authorizes the Attorney General to seek relief “against such parties ... as may be appropriate.” 20 U.S.C. § 1706. It is particularly “appropriate” that the State defendants be participants in this litigation, since their authority over the local district may well require their involvement in any remedial action that might be required. See Brinkman v. Gilligan, 503 F.2d 684, 704 (6th Cir. 1974). Cf. Bradley v. Milliken, 540 F.2d 229, 242-45 (6th Cir. 1976), aff’d 433 U.S. 267, 97 S.Ct. 380, 50 L.Ed.2d 325 (1977).
As an alternative ground for dismissing the EEOA claims against the State defendants, the District Court held that the Attorney General had failed to meet the following statutory prerequisites to suit as to the State defendants:
The Attorney General shall not institute a civil action under section 1706 of this title before he—
(a) gives to the appropriate educational agency notice of the condition or conditions which, in his judgment, constitute a violation of part 2 of this subchapter; and
(b) certifies to the appropriate district court of the United States that he is satisfied that such educational agency has not, within a reasonable time after such notice, undertaken appropriate remedial action.
20 U.S.C. § 1710.
The District Court found that the certificate filed by the Attorney General under subsection (b) “indicate[d] that the local school authorities, but not the State defendants, had been notified.” The Court therefore held that the Attorney General had failed to state a claim against the State defendants.
The Attorney General’s certificate, which was appended to and referenced in the complaint, reads as follows:
CERTIFICATE OF THE ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA
Edward H. Levi, Attorney General of the United States of America, certifies that, pursuant to Section 211 of the Equal Educational Opportunities Act of 1974,1 have, through the Assistant Attorney General of the Civil Rights Division, given the appropriate educational agencies notice of the conditions which, in my judgment, constitute a denial of an equal educational opportunity on account of race in the School District of the City of Ferndale, Michigan, and I am satisfied that the educational agencies have not undertaken the appropriate and necessary remedial action within a reasonable time after such notice was given.
Signed this 11th day of July, 1975. /s/ EDWARD H. LEVI
Attorney General
We do not see how the District Court read this certificate as indicting that only the local school authorities had been noti *1349 fied. The certificate clearly states that the Attorney General has “given the appropriate educational agencies notice.” (emphasis supplied). Had only the local agency been notified, presumably the singular would have been used. The complaint plainly alleges that the proper steps were taken, and this was sufficient to withstand dismissal for failure to state a claim under Rule 12(b)(6). See also Rule 8.
Accordingly, the judgment of the District Court dismissing Count I of the Complaint against the State defendants is reversed.
D. Denial of Summary Judgment
Prior to dismissal of the EEOA claims, the United States filed a motion for partial summary judgment as to those claims. The motion was based on the theory that the District Court should give collateral estoppel effect to findings of fact made in the 1969 HEW fund termination proceeding. Application of the doctrine under these circumstances would compel the District Court to find for the United States on many material issues in the ease. The District Court denied the motion on various grounds. 400 F.Supp. 1141. We affirm.
It is basic to the law of collateral estoppel that a finding in one proceeding cannot bind tribunals in subsequent cases unless the finding acted as a basis for final judgment in the first. See The Evergreens v. Nunan, 141 F.2d 927, 929 (2d Cir. 1944). If “the judgment in the former suit could be based on an issue not involved in the later suit and it is not made to appear on which of the several issues the judgment was based, estoppel by judgment does not arise.” Dixie Sand & Gravel Corp. v. Holland, 255 F.2d 304, 310 (6th Cir. 1958). Here, the decision of the HEW Reviewing Authority — which is the decision to which we must look in the first instance[16] — is ambiguous as to the findings upon which it is based. Although two members of the four-member reviewing panel expressly affirmed most of the Hearing Examiner’s findings, the other two members filed a specially concurring opinion in which they indicated a belief that the Examiner’s findings were largely unnecessary. The concurring members apparently felt that they merely needed to decide 1) whether the school district had submitted to HEW a written “assurance” that it would comply with all the requirements imposed by Title VI of the Civil Rights Act of 1964, and 2) whether after submission of that assurance Grant remained a racially identifiable school.[17] Neither of these issues has ever been in dispute in this case — it is conceded that the school district submitted the “as *1350 surance” in 1965 and that Grant remained a black school afterward, at least until 1975. It thus cannot be said that the HEW decision was necessarily based on findings as to matters at issue in the instant litigation.
The concurring opinion does express agreement with the finding of segregatory purpose made by the other two members. But this agreement is expressed only in the context of a clear indication by the concurring members that a finding of intent was unnecessary. At best “it is not made to appear on which of the several issues the judgment was based.” Dixie Sand & Gravel, supra, 255 F.2d at 310.
Because we conclude that a basic prerequisite for collateral estoppel has not been met, we need not reach the more complex question of whether application of the doctrine would be appropriate in light of the legal and procedural standards applied in HEW fund termination proceedings. See, e. g., Tipler v. E. I. duPont deNemours & Co., 443 F.2d 125, 128-30 (6th Cir. 1971); State of North Carolina v. Chas. Pfizer & Co., Inc., 537 F.2d 67, 73-74 (4th Cir.), cert. den., 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976).
The judgment of the District Court denying the United States’ motion for partial summary judgment is affirmed.
E. Disposition
The EEOA suit is remanded to the District Court for further proceedings consistent with this opinion.
II. TITLE IV SUIT
The second suit was brought pursuant to Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, which authorizes the Attorney General to initiate desegregation actions in specified circumstances, based on alleged denials of equal protection of the laws by school boards. The Title IV complaint contains factual allegations similar to those in the EEOA complaint[18] and includes a request for a permanent injunction against operation of the Ferndale schools in a racially discriminatory manner.
Several months after filing the complaint, the United States moved for a preliminary injunction directing the local school district to develop and implement a desegregation plan in time for the 1976-77 school year. After presentation of evidence by the United States at a hearing on the motion, the defendant Ferndale School Board[19] requested that the motion be denied without presentation of evidence by the defense. Thereupon the District Court denied the motion for a preliminary injunction. The United States appeals pursuant to 28 U.S.C. § 1292(a)(1), arguing that the District Court’s decision is based on erroneous conclusions of law and is tainted by improper evidentiary rulings at the preliminary injunction hearing.
Ordinarily, the grant or denial of injunctive relief by a District Court is reviewable only for abuse of discretion. See, e. g., S.E.C. v. Senex Corp., 534 F.2d.l240, *1351 1241 (6th Cir. 1976). Improper application of the law, however, is itself an abuse of discretion. Clemons v. Board of Ed. of Hillsboro, 228 F.2d 853, 857 (6th Cir.), cert. den., 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956). An appellate court may reverse if the decision below was based on an erroneous view of the law, or if procedural error intervened in the proceedings. See 11 Wright & Miller, Federal Prac. & Proced. § 2962 at 636-38 (1973). Accordingly, we think it appropriate to consider the claims of legal error asserted by the United States.
A. Legal Conclusions
The relevant portions of the District Court’s unreported decision denying preliminary injunctive relief read as follows:
Four factors are traditionally considered by courts in determining whether to grant a preliminary injunction. The Court must consider (1) whether the petitioner made a strong showing that he is likely to prevail on the merits; (2) whether the petitioner has shown that in the absence of preliminary injunctive relief, petitioner, or those on whose behalf he is acting, will suffer irreparable harm; (3) whether issuance of the preliminary injunction would substantially harm other parties; and (4) where lies the public interest. .
In order to prevail on the merits in the case, plaintiff would have to show a violation by defendant of the constitutional rights of the black elementary students at the Grant School, i. e., the de jure segregation of those students. Defendant, in its written response to the motion, objects to this issue being decided on a motion for preliminary injunction before it has been afforded a full opportunity for discovery. The defendant does not dispute, and indeed, the evidence presented by the plaintiff makes it clear, that until the introduction of the integrated open classroom program, the Grant Elementary School had a black student body. The defendant insists, however, that it has always had a neighborhood school policy and that the black student body at Grant results from housing patterns rather than the conduct of the school board. It points out that there are black elementary students in other schools in the district, although relatively few in number, and that there have been black students in these other schools for many years. On this basis, the defendant urges that it is not clear that the plaintiff will prevail on the merits.
The second consideration that the - plaintiff must satisfy is that it must show that irreparable harm would be sustained in the absence of preliminary relief. If defendant school board has been practicing de jure segregation, the plaintiff, as a matter of law, is suffering irreparable harm and is entitled to injunctive relief. However, no order that the court would issue at the present time would provide it with immediate relief from that irreparable harm. Even if the Court found that the petitioner had made a strong showing that it was likely to prevail on the merits, section 1752, Title 20, United States Code, expressly provides:
Notwithstanding any other law or provision of law, in the case of any order on the part of any United States district court which requires the transfer or transportation of any student or students from any school attendance area prescribed by competent State or local authorities for the purposes of achieving a balance among students with respect to race, sex, religion or socioeconomic status, the effectiveness of .such order shall be postponed until all appeals in connection with such order have been exhausted or, in the event no appeals are taken, until the time for such appeals has expired.
The issuance of a preliminary injunction would, therefore, afford the plaintiffs no immediate relief. An additional consideration is that an erroneous issuance of a preliminary injunction would substantially harm other parties. The transfer of children from one school to another by court order is not merely a matter of expense or inconvenience but is a disruption in the lives of those children and their families.
*1352 Although it may be argued that this statutorily required delay would prevent the disruption, the court’s order, even if prospective in effect, could cause disruption in the community.
In the Court’s opinion, the type of relief requested in the instant case should be ordered only if plaintiff has prevailed after a full trial of the issues in the case and an orderly presentation of the evidence after prompt but full discovery. This conclusion is reinforced by language found in a recent Supreme Court opinion:
“Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.” Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).
In [Alexander v. Holmes Co. Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969)], the United States Supreme Court directed that the school district involved immediately begin to operate as a unitary school system. In that case, there existed no question but that there had been de jure segregation since two separate school systems, one for blacks and one for whites, had been operated by the defendant. Plaintiff makes no such allegation in the instant case where admittedly both the high school and junior high schools are and have been fully integregated. (sic). Excluding the four black teachers at Grant, there are black teachers at the schools in a ratio approximately the same as the total black enrollment in the school system. The unitary nature of the FERNDALE SCHOOL system is further established by the plaintiff’s evidence that during school years there have always been a few black students at other elementary schools.
. [A]s to any particular individual student at Grant, it would appear that that student can either (1) attend the fully integrated open classroom at Grant, the school which is nearest to his home; (2) attend any other school in the district, or (3) attend the traditional classrooms at the Grant school which conced-edly have no white students. Over 25 percent of the black students in the Grant attendance area have elected one of the first two alternatives. In view of these options, any particular child can avoid the irreparable harm by electing the open classroom or attending another school.
We have carefully reviewed the decision and agree with the United States that it contains several material errors of law. At the outset, the District Court failed to make an express finding as to probability of success on the merits. Such a finding is important in deciding on whether to grant injunctive relief. See, e. g., S.E.C. v. Senex Corp., 534 F.2d 1240, 1241 (6th Cir. 1976). Unless another factor is completely dispositive, we think express findings of fact and conclusions of law on the issue are required by Federal Rule of Civil Procedure 52(a). See Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774 (1940).
Although express findings were not made, the Court appeared to attach significance to the school district’s claim that “it has always had a neighborhood school policy.” We question the value of this assertion by the school district when unsupported by presentation of evidence below. In any event its legal significance is problematical. The “mere assertion of [a ‘neighborhood school’] policy is not dispositive where . . . the school authorities have been found to have practiced de jure segregation in a meaningful portion of the school system by techniques that indicate that the ‘neighborhood school’ concept has not been maintained free of manipulation.” Keyes v. School District No. 1, 413 U.S. 189, 212, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973). See N.A.A.C.P. v. Lansing Bd. of Ed., 559 F.2d 1042, 1049 (6th Cir.), cert. den., 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977). The United States alleges just such “manipulation” in this case.
On the issue of irreparable harm to the Plaintiff the District Court indicated that *1353 individual black elementary students could avoid the harm of state imposed segregation by participating in the “open classroom” and “open enrollment” programs recently instituted by the school board. It is well established, however, that “open enrollment” and “freedom of choice” plans correct denial of equal protection of laws to black students only where they effectuate a conversion to “a unitary, non-racial system.” Green v. County School Bd., 391 U.S. 430, 441, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). If the United States is correct in its claim that the school district still suffers from state imposed segregation, or the vestiges thereof, the mere availability of open enrollment does not correct the harm. An open enrollment plan that does not eliminate state-imposed segregation “root and branch” merely operates to “burden children and their parents with a responsibility which Brown IT[20] placed squarely on the School Board.” Green, supra, 391 U.S. at 441-42, 88 S.Ct. at 1696.
Absent a finding by the District Court that the Ferndale open enrollment plan has removed all vestiges of a dual school system, it was erroneous to conclude that any harm to black students was mitigated by such a plan. It is axiomatic that black students, particularly in the elementary grades, suffer irreparable harm from the maintenance of a segregated school system. See Brown v. Board of Education, 347 U.S. 483, 493-95, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The constitutional command is that dual school systems be dismantled at once. Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Surely it cannot be said that movement of seven black elementary students to predominantly white schools fulfills this requirement, where several hundred black elementary students — nearly all of those in the district — remain in one school.[21] Nor can an “open classroom” program be considered effective in ending segregation where a substantial number of black students remain in a traditional program separated from white students in the same building.[22]
We also reject the District Court’s conclusion that preliminary injunctive relief would necessarily be delayed by the requirements of 20 U.S.C. § 1752. That provision does not affect court efforts to eradicate state-imposed segregation. Morgan v. Kerrigan, 523 F.2d 917, 920 (1st Cir. 1975). Section 1752 merely restates the provisions of 20 U.S.C. § 1653 (now expired), which we found inapplicable to an injunction against de jure segregation in N.A.A.C.P. v. Lansing Bd. of Ed., 485 F.2d 569, 570 (6th Cir. 1973). See Newburg Area Council v. Gordon, 521 F.2d 578, 581 (6th Cir. 1975).
As to the general propriety of preliminary injunctions in school desegregation cases, we have never adopted the view suggested by the District Court that such relief “should be ordered only if the plaintiff has prevailed after a full trial of the issues in the case.” In both N.A.A.C.P. v. Lansing Bd. of Ed., 485 F.2d 569 (6th Cir. 1973), and Oliver v. School Dist. of City of Kalamazoo, 448 F.2d 635 (6th Cir. 1971), we affirmed the issuance of preliminary injunctions ordering implementation of desegregation plans. In neither case had there been a full trial on the merits. Both involved school systems much larger than the one involved here.[23] See also United States v. School *1354 Dist. 151 of Cook County, 404 F.2d 1125 (7th Cir. 1968), cert. den., 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971).
Finally, we reject the District Court’s conclusion that the “unitary nature” of the Ferndale School system is shown by the fact that “during school years [sic] there have always been a few black students” at elementary schools other than Grant. The United States does not claim that the school district has by law forbidden white students and black students from attending the same institutions. Rather, the charge is that school officials have deliberately followed policies of student assignment, faculty assignment, school construction and drawing of attendance zones designed to ' produce segregatory results. Such state imposed segregation is no less violative of the Constitution than segregation required by statute. Keyes v. School Dist. No. 1, 413 U.S. 189, 201-03, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The fact that a policy of segregation does not succeed in placing every black student in the same school does not make the system unitary; as long as the policy has some segregative effect and that effect or its vestiges remain, the system is still a “dual” one for constitutional purposes. See Swann v. Bd. of Ed., 402 U.S. 1,15,91 S.Ct. 1267, 28 L.Ed. 554 (1971); Green v. County Sch. Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Oliver v. Michigan State Bd. of Ed., 508 F.2d 178, 182 (6th Cir. 1974).
B. Evidentiary Rulings
At the preliminary injunction hearing, the United States offered as evidence the findings of the HEW Hearing Examiner from the 1969 fund termination proceeding. As previously noted, the Hearing Examiner
found, inter alia, that Grant school had been established and maintained as a black school for segregatory purposes. The District Court excluded the findings as hearsay and as untrustworthy evidence.
The United States asserts that the findings, while hearsay, are admissible under Federal Rule of Evidence SOS^XC)[24] as a public record or report. The district court ruled that the findings did not fall within the scope of Rule 803(8)(C) since they were not “factual findings resulting from an investigation made pursuant to authority granted by law.” In particular, the court felt the HEW proceedings did not amount to an “investigation” but rather constituted a “quasi-judicial hearing.”
We agree with the United States that the HEW findings come within the scope of Rule 803(8)(C) as they are “factual findings resulting from an investigation made pursuant to authority granted by law.” The investigation vs. adjudication distinction fashioned by the district court finds no support in the rule or the cases interpreting it. The Supreme Court has construed Rule 803(8)(C) to apply in an analogous situation. Chandler v. Roudebush, 425 U.S. 840, 863 n.39, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). See also Hackley v. Roudebush, 171 U.S.App.D.C. 376, 520 F.2d 108, 150-51 & 156-57 n.195 (1975). Clearly, the HEW proceedings were an “investigation” into the state of affairs in the Fern-dale schools within the plain meaning of that word. That the proceedings could also be labelled a “quasi-judicial hearing” is of no consequence in this regard.
The District Court’s concern as to the trustworthiness of the findings was based in part on the lack of subpoena power for *1355 the school district at the HEW proceedings, the unavailability of discovery, and the absence of any showing that the hearing examiner had special expertise. These were appropriate concerns on the part of the district court, but none were sufficient to cause serious doubts about the overall trustworthiness of the proceedings. Trustworthy means worthy of confidence or dependable,[25] and the above concerns of the district court do not demonstrate a lack of those characteristics. If anything, they only suggest a possible lack of completeness in the HEW proceedings, which can be remedied by the school district in this proceeding in federal court where it has full subpoena power and wide discovery rights. A bald assertion that the HEW hearing examiner was not an expert does not necessarily affect the trustworthiness of the. ultimate findings. Perhaps these factors affect the weight given to the findings, but not their admissibility. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 n.21, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). We see nothing in the record to justify the complete exclusion of the hearing examiner’s report from evidence.
We find no error in the other evidentiary rulings challenged by the United States.[26]
C. Disposition
In light of the erroneous conclusions of law and evidentiary rulings discussed above, we cannot affirm the District Court’s denial of preliminary injunctive relief. Our view in this regard is fortified by the strength of the case presented. The United States has offered considerable evidence that Grant school was initially established as a black institution. According to the HEW Hearing Examiner, local school officials followed policies in subsequent years designed to maintain Grant’s racial makeup. The school district’s open classroom and freedom of choice plans have been ineffective in negating the racially identifiable character of Grant, at least in those years for which statistics are before this Court. Perhaps most significantly, black faculty assignments at Grant have far exceeded the proportion at other elementary schools in the district. Where it is possible to identify a “white school” or a “Negro school” simply by reference to the racial composition of teachers and staff, a prima facie case of violation of substantive constitutional rights under the equal protection clause is shown.[27] Swann v. Board of Ed., 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554.
We are reluctant, however, to decide on the merits of ordering a preliminary injunction when the defendants have yet to present evidence. Accordingly, the judgment of the District Court in the Title IV suit is vacated, and the motion for prelimh nary injunction remanded for consolidation with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). In light of the irreparable harm alleged, the District Court is instructed to schedule trial not more than sixty days from the date of filing of this opinion. Every effort should be made to resolve the issues in this case prior to commencement of the 1978-79 school year. In the interests of facilitating complete relief, we strongly suggest that the EEOA suit be consolidated for trial with the Title IV suit.

. The school district operates only one high school and one junior high school, both of which are racially integrated.

. Figures are based on stipulated projections made by parties to this case prior to the start of the 1975-76 school year.

. In addition to the EEOA claim, the complaint alleged violation of the Federal Revenue Sharing Act, 31 U.S.C. §§ 1221, et seq., by several of the State defendants. The Revenue Sharing allegations are not at issue in this appeal.

. The District Court reached the summary judgment motion only because it dismissed the EEOA claims with leave to amend. 400 F.Supp. at 1143.

. The original complaint was dismissed with leave to amend. 400 F.Supp. 1122. The United States subsequently filed an amended complaint. “The complaint,” as used herein refers to the amended complaint only.

. The complaint also identifies the black faculty and staff of the elementary schools as persons represented. The District Court properly discounted this claim. 400 F.Supp. at 1128-29. Although racial discrimination with regard to faculty may well constitute a violation of the EEOA (see 20 U.S.C. § 1703(d)), the Act’s protection is provided for the direct benefit of students rather than teachers. See 20 U.S.C. § 1701(a)(1).

. For example, students in integrated programs may still be denied equal educational opportunity if those programs fail “to remove the vestiges of a dual school system.” 20 U.S.C. § 1703(b).

. Congress clearly contemplated a broad role for the Attorney General in enforcing the remedial provisions of the EEOA. Not only is he permitted to file suit on behalf of an individual, but he may also intervene in any action initially brought by an individual under the statute. 20 U.S.C. § 1709. Moreover, he need not await receipt of a written complaint from the individual as is required for desegregation suits by the Attorney General under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000C-6.

. The District Court suggested that specificity was required in the complaint because the EEOA’s purpose was to vindicate “the individual rights of those discriminated against” as opposed to a “national policy of school desegregation.” 400 F.Supp. at 1128. This reading is totally inconsistent with the Act’s statement of purpose: “[to] specify appropriate remedies for the elimination of the vestiges of dual school systems." 20 U.S.C. § 1702(b) (emphasis supplied).

. See paragraph 8 of the complaint, set out in the text, supra.

. The Attorney General does not assert before this Court that he has authority to file desegregation suits under the fourteenth amendment without statutory authorization. The fourteenth amendment claim here is wholly subsidiary to the EEOA claim, and is not asserted as an independent cause of action.

. Of course, there is nothing to prevent the Attorney General from asserting violations of the EEOA and the fourteenth amendment in the same complaint where relief is sought under both the EEOA and Title IV. See Federal Rule of Civil Procedure 8(e).

. Under the Act, “educational agency” is defined as "a local educational agency or a ‘State educational agency.’ ” 20 U.S.C. § 1720(a).

. The legislative history of the EEOA is of little assistance on this issue. See 1974 U.S. Code Cong. & Admin.News, p. 4093. See generally 400 F.Supp. at 1126.

. The parties have stipulated that the Fern-dale School District receives approximately 40% of its annual operating budget from the State.

. See IB J. Moore, Federal Practice Í1 0.416[2] at 2232 (2d Ed.).

. The relevant portions of the concurring opinion read as follows:
The writers of this portion of the opinion are of the impression that it is unnecessary to a decision to ascertain the motives and intent of the Respondent School Board in 1925-26.
The Notice of Opportunity for Hearing, in Paragraph 6, contains the following allegation:
“6. In 1965, Respondent School District submitted to the Department a written assurance (HEW Form 441) that it would comply with Title VI of the Civil Rights Act of 1964 and all requirements imposed by or pursuant to the Regulation; and Respondent School District further gave assurance that it would immediately take any measures necessary to effectuate the aforementioned agreement.”
The said Form 441 states, in part, that the applicant “HEREBY AGREES THAT it will comply with Title VI .to the end that, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Applicant received Federal financial assistance from the Department: and HEREBY GIVES ASSURANCE THAT it will immediately take any measures necessary to effectuate this agreement." (Emphasis added)
Given the facts of this case, i. e., an all-black school with a majority black faculty, the question is raised as to whether or not we have a racially identifiable school, either as to student body or faculty or both, as a result of discriminatory practices or failure to effectuate the agreement contained in H.E.W. Form 441 referred to above. This school, together with the obligations of Title VI and the Regulation, presents the Respondent School Board, pursuant to its execution of Form 441, with the duty to avoid pupil placement and/or faculty employment practices which lead to segregation by race. When the racial identifiability occurred is not a matter of great moment from the point of view of reaching this decision. Even if the Respondent had no obligation to correct such practices in the past, it did, how *1350 ever, assume an affirmative obligation to avoid these practices by its execution of Form 441.
The writers of this concurring opinion, having considered the difficulties of ascertaining past motives and intent, and having expressed the opinion that such determination is unnecessary to this decision, agree that the total record of this proceeding is such that it enables the Reviewing Authority to affirm the initial decision and to make such rulings as two of our brethren felt compelled to do. Respondent’s exhibits D-28, pages 2-3, and D-29, page 3, when considered with Government’s exhibits D-45, pages 1, 2, and 3 and D-46, pages 1 and 2 are sufficient to give rise to an inference of a segregatory purpose in the establishment and maintenance of Grant as an all-black school. . . . [citations omitted]

. The Title IV complaint names fewer defendants than the EEOA complaint. The Title IV defendants are the School District of the City of Ferndale, the Superintendent of the School District, the State of Michigan, the Michigan State Board of Education, and the Michigan Superintendent of Public Instruction.

. Prior to the preliminary injunction hearing, the District Court granted summary judgment to the State defendants dismissing the Title IV complaint against them on procedural grounds without prejudice. The District Court’s oral opinion granting summary judgment does not appear in the record. We are thus unable to review it at this time, even if we were to decide that such review is appropriate on an appeal under 28 U.S.C. 1292(a)(1).

. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

. In the fall of 1976, the local defendants filed a brief with the District Court in which it was claimed that 50 Grant area black students had elected the “open enrollment” option for the 1976-77 school year. The District Court relied on this allegation in denying the preliminary injunction, even though no evidence was offered to support it. Even if the allegation is true, however, approximately 75% of the black elementary students in the District would still be in Grant’s segregated traditional program. Under such conditions, Grant would still clearly remain a racially identifiable school.

. See Boykins v. Fairfield Bd. of Ed., 457 F.2d 1091, 1096-97 (5th Cir. 1972), cert. den., 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

. The District Court’s reliance on Village of Arlington Heights v. Metropolitan Housing Devel. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), is misplaced. The mere fact that the inquiry into discriminatory intent must be a “sensitive” one does not automatically preclude preliminary relief. There is no general rule against granting preliminary relief *1354 where questions of intent are material to a disposition on the merits.

. F.R.Evid. 803:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * ifc * * *
(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

. Webster’s Third New International Dictionary.

. These rulings excluded two exhibits offered by the United States on the ground that they had not been properly authenticated. Our af-firmance does not preclude admission of the exhibits in subsequent proceedings upon proper authentication. The exhibits apparently qualify as “ancient documents” under Federal Rule of Evidence 803(16). They will thus be admissible if the United States can satisfy the general guidelines of Federal Rule of Evidence 901(b)(8).

. Certainly this was the case at Grant school through the 1974-75 school year. See note 1 and accompanying text,' supra. Even under the school district’s projected figures for 1976-77, the traditional program at Grant had a 50% black faculty — far in excess of the normal district-wide percentage.