Flora SANTANA et al., Plaintiffs,

v.

UNITED STATES of America,
Plaintiff–Intervenor,

v.

Jenaro Collazo COLLAZO et
al., Defendants.

Civ. Nos. 75–1187, 75–1213 and 75–1466.

United States District Court,
D. Puerto Rico.

Sept. 11, 1980.

María Laura Colón and Jaime L. Rivera Suárez, P. R. Legal Services, Hato Rey, P. R., Harry F. Swanger, National Juvenile Law Center, St. Louis University School of Law, St. Louis, Mo., for plaintiffs.

Miriam Naveira de Rodón, Roberto Armstrong, Jr., Marta Quiñones de Torres, Ramírez & Rivera, Hato Rey, P. R., for defendants.

## DECISION AND ORDER

TORRUELLA, District Judge.

This matter is presently before us on Defendants' Motion to Dismiss the United States of America's "Complaint In Intervention."

### BACKGROUND

This action is a consolidation of three separate suits, *Santana v. Collazo*, Civil Number 75–1187 (filed on October 10, 1975), *Olivo v. Ríos*, Civil Number 75–1213 (filed on October 24, 1975) and *Ibañez v. Ríos*, Civil Number 75–1466 (filed on December 12, 1975). In these suits Plaintiffs allege that juveniles confined in the Mayaguez Industrial School in Mayaguez, Puerto Rico and the Maricao Juvenile Camp in Maricao, Puerto Rico are being denied their constitutional rights. On August 10, 1976 these actions were certified as class actions, the class being composed of all present and future juveniles who are committed to the Industrial School and Juvenile Camp.

Plaintiffs' complaints were filed pursuant to 42 U.S.C. § 1983 and seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1651, 2201 and 2202. They claim in

substance, that Defendants acting under color of state law deprived Plaintiffs of their constitutional and civil rights, including, *inter alia*, the right to due process of law prior to denial of liberty, the right to be free from cruel and unusual punishment, the right to be free from involuntary servitude, the right to equal protection of the laws, and the right to rehabilitation and treatment services. More specifically Plaintiffs claim: (1) utilization of extensive seclusion in solitary confinement without basic necessities and treatment services; (2) prolonged disciplinary confinement imposed without due process; (3) lack of individualized, comprehensive rehabilitation plans; (4) inadequate opportunities for education and rehabilitation; (5) inadequate medical care, including lack of psychiatric and psychological services; (6) unsanitary conditions throughout the institutions; (7) lack of opportunities for physical exercise and recreation; and (8) that inadequately qualified and trained staff is responsible for the juvenile's rehabilitation. Plaintiffs seek declaratory relief to specify minimal constitutional standards for adequate rehabilitation of juveniles, and injunctive relief to rectify the alleged unconstitutional conditions, policies and practices. They also wish to enjoin Defendants from further admitting juveniles into these institutions until the constitutional standards which they claim are violated have been achieved.

*Complaint in Intervention*

The Complaint in Intervention was tendered on November 29, 1976. On December 3, 1976, Defendants filed a Motion for extension of time within which to respond to the Motion to Intervene. On December 6, 1976 the Court granted the intervention without explicitly ruling on the Motion for Extension (on March 10, 1977, the Magistrate denied it as moot). On February 4, 1977 Defendants answered the Complaint in Intervention and alleged Plaintiff–Intervenor's lack of standing as an affirmative defense.

Plaintiff–Intervenor's Complaint alleges that Defendants' acts and omissions are violative of the confined juveniles' rights under the Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments of the Constitution. It charges that: (1) juveniles with mental retardation, emotional disturbance and other handicaps are inappropriately placed in institutions which lack appropriate treatment services; (2) juveniles are placed in the Industrial School or Juvenile Camp without due consideration, development or operation of alternative community–based placements which are less restrictive in nature and conditions; (3) juveniles are denied the right to treatment and rehabilitative care, because of inadequate staff and facilities, lack of appropriate treatment and rehabilitative plans, and inhumane physical and psychological environment which fails to provide minimum standards of safety and health; (4) juveniles are subjected to extreme and unnecessary disciplinary measures, including prolonged solitary confinement and corporal punishment; (5) juveniles are forced to undergo excessive and/or non–therapeutic sedation by injection or ingestion of tranquilizing drugs; (6) juveniles are forced to perform non–therapeutic, institution–maintaining labor without financial compensation; and (7) juveniles are deprived of adequate and appropriate education, training and treatment services. Plaintiff–Intervenor requests a declaratory judgment and injunction against Defendants for failing or refusing to provide appropriate care and treatment in the least restrictive setting to all juveniles in their control or custody.

The intervening complaint's jurisdictional statement claims that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(3) and that declaratory relief is authorized in accordance with 28 U.S.C. §§ 2201 and 2202. It also states the following:

"... The proper care and treatment of such juveniles is a matter of direct concern to the United States as evidenced by congressional enactments in the area of juvenile justice as: Juvenile Delinquency and Youth Offenses Control Act of 1961 (PL 87–274), Title I of the Elementary and Secondary Education Act of 1965 (20

U.S.C. § 240C) (75 Stat. § 572); Juvenile Delinquency Prevention and Control Act of 1968 (42 U.S.C. § 3812); Juvenile Delinquency Prevention Act (42 U.S.C. §§ 3811 *et seq.*); Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. §§ 5601 *et seq.*); Federal Youth Corrections Act (18 U.S.C. § 5001 *et seq.*). As well as in related areas such as: Titles IV and XIX of the Social Security Act, as amended (42 U.S.C. §§ 601 *et seq.* and §§ 1396 *et seq.*); the Developmentally Disabled Assistance and Bill of Rights Act (42 U.S.C. §§ 6001 *et seq.*)."

Both before and after the granting of the intervention in this case the parties engaged in extensive discovery, including Court–sanctioned participant observation studies. Thereafter, at the request and urging of the Court all parties, including Plaintiff–Intervenor, engaged in various settlement negotiations and agreements, which proposals were denied approval in our orders of January 18 and September 5, 1979. In its Order of January 18, 1979 the Court stated as grounds for refusing to approve the settlement its belief that it encompassed matters "far beyond the case and controversy alleged in the complaint and therefore exceed[ed] the powers of this Court under Article III of the Constitution."

The trial on the merits commenced on December 3, 1979. Thereafter, 16 days of trial were held intermittently (including a visual inspection of the premises), during which Defendants filed the present challenge to the intervention by the United States of America, by way of a Motion under Rule 12(h)(2) of the Federal Rules of Civil Procedure.

Although in its order of June 5, 1980, this Court granted Defendants' Motion, more recent developments, including the passage of the "Civil Rights of Institutionalized Persons Act", Pub.L. 96–247, on May 23, 1980, convinced us that there was need for further deliberation on this matter. Unfortunately for Plaintiff–Intervenor, our deliberation in the light of this Statute only convinces us of the correctness of our June 5th

Order, although some modification of the outcome is required.

*Timeliness*

██ Before entering into the merits of this issue we must confess to being initially disturbed by the fact that this question is being decided at this late date. This Court is at least partly to blame for this situation in that we granted the intervention without giving Defendants an opportunity to file an opposition thereto at an early date. Plaintiff parties have not been really prejudiced by this, and in fact Plaintiffs have actually benefited as they have received the aid and support of the full resources of Plaintiff–Intervenor. The benefits of this aid and support are still available to Plaintiffs even after we rule against Plaintiff–Intervenors, as presumably all evidence discovered and all witnesses to be presented can still be brought forth, either voluntarily or by the use of the Court's subpoena powers. Furthermore, since Defendants raised the issue of standing as an affirmative defense in their responsive pleading (Cf. Rule 12(b)(6)), we will in any event be forced to decide this matter before reaching the merits of this case. Additionally, not only does Rule 12(h)(2) permit this defense to be raised "at the trial on the merits", (see *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)), but as it is a jurisdictional issue under the circumstances of this case, standing is not waivable and is always the subject of inquiry. As the Supreme Court stated in *Data Processing Service v. Camp*, 397 U.S. 150, 150–151, 90 S.Ct. 827, 827–29, 25 L.Ed.2d 184 (1970):

"Generalizations about standing to sue are largely worthless as such. One generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.' As we recently stated in *Flast v. Cohen*, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947], '[I]n terms of Article III limitations on *federal court*

*jurisdiction,* the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' ..." (Emphasis supplied).

We thus hold that the issue of the United States' standing as a Plaintiff–Intervenor in this case has been raised in a timely fashion and must be decided by this Court at this time.

*Standing*

*Before Pub.L. 96–247*

No discussion of the issue of standing is complete without reference to the Supreme Court's ruling in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), a decision which summarizes the law, at pages 498–502, 95 S.Ct. at pages 2204–2207:

... "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal–court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper–and properly limited–role of the courts in a democratic society.

In its constitutional dimension, standing imports justiciability whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* [emphasis in the original] invocation of federal–court jurisdiction and to justify exercise of the court's remedial power on his behalf. The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action ...'

Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers.... [E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the *plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties.*

.      .      .      .      .

Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. *The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing...'* Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, *the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.* In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff. Moreover, *Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury*

*to himself even if it is an injury shared by a large class of other possible litigants. But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.*

One further preliminary matter requires discussion. For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. *If, after this opportunity the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.*" (Emphasis supplied, except as indicated). (Footnotes and citations omitted).

See also *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 6613 (1962); *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Duke Power Co. v. Carolina Env. Study Group*, supra; *Arlington Heights v. Metropolitan Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ The "personal stake" that is demanded of the federal litigant requires not only "a distinct and palpable injury" to Plaintiff but also a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Env. Study Group*, supra, 438 U.S. at page 72, 98 S.Ct. at page 2629.

■ No federal court can excuse any litigant, whether it be a private citizen or the United States of America, from complying with the constitutional requirements of Article III as stated above.

The United States, in its Motion for Leave To Intervene, stated as grounds for its claim to standing, that it "has a substantial and legally protectible interest in vindicating the constitutional rights of its juvenile citizens", that the protection of the constitutional rights of juveniles is a national policy of the United States, and that it also "has an interest, if not an obligation, to assure that federal monies spent in fulfilling [this] national policy are utilized in a manner not inconsistent with the constitutional rights of the ultimate beneficiaries of the programs."

We see this as a two–pronged approach: one based on an alleged general national interest in the protection and vindication of its juvenile citizens, and the second, on an equally nebulous reference to "seeing that federal funds are spent in a constitutional manner."

The second contention bears close scrutiny because, it goes without saying that if the Federal government's funds are being used by the Commonwealth in a manner other than as contracted for, the United States would have standing to intervene by reason of its pecuniary interest.

■ Intervenor (in its December 21, 1980 Memorandum) claims that "millions are spent annually for the care and treatment of juvenile citizens. Moreover, the Department of Social Services itself receives substantial funds under a number of federal statutes.–Title I of the Elementary and Secondary Act of 1965 . . .; the Developmental Disabled Assistance and Bill of Rights Act . . .; the Comprehensive Employment and Training Act . . .; and the Juvenile Justice and Delinquency Prevention Act . . . (through the Puerto Rico Crime Commission). Plainly, the United States *could* sue to enforce the conditions attached to grants received under the above programs." (emphasis supplied). But the fact that the United States *could* sue for

such a matter does not mean that this is what *this* case is about. A reading of the Complaint in Intervention unequivocally convinces us that it is not a suit to enforce conditions of Federal grants, as is now claimed by the Government counsel. In truth, the only reference made in the intervening complaint to some of those statutes (see page 4, supra in this decision) is the allegation that their enactment is evidence of the "direct concern to the United States . . . in the area of juvenile justice." See Paragraph 2 of the Complaint in Intervention. Nowhere in the Complaint is there any allegation, nor even insinuation, that grants are being misused or that this suit is for the purpose of correcting such action. The present attempt by counsel for Plaintiff–Intervenor to so construe this controversy is not only a misreading of the clear allegations on the Complaint in Intervention but smacks of an attempt to mislead this Court.

The first contention, that is, the Government's standing based on alleged general national interest, relies on a misapplication of *In Re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895).

*Debs* concerned a writ of habeas corpus brought by various labor leaders to challenge their conviction for contempt for violating an order of the Circuit Court prohibiting their engaging in various acts of violence during the course of a railroad strike that took place in Chicago in May, 1894. The Department of Justice had instituted the suit seeking to enjoin these actions on the basis that the interstate transportation of persons and property, as well as the flow of the mails, was being forcibly obstructed. Of basic importance to determining the merits thereof was an inquiry into whether "the relations of the general government to interstate commerce and the transportation of the mails [were] such as authorize a direct interference to prevent a forcible obstruction thereof." Id., at page 577, 15 S.Ct. at page 903. The Court ruled that the question should be answered in the affirmative.

It is important to read this case in the context within which it was decided, and this is best described by the Court itself at page 592, 15 S.Ct. at page 909 of the opinion:

"That the bill filed in this case alleged *special facts* calling for the exercise of all the powers of the court is not open to question. The picture drawn in it of the vast interests involved, not merely of the city of Chicago and the State of Illinois, but of *all the States*, and the general confusion into which the interstate commerce of *the country* was thrown; the forcible interference with that commerce; the attempted exercise by individuals of powers belonging only to government, and the threatened continuance of such invasions of public right, presented a condition of affairs which called for the fullest exercise of all the powers of the courts. If ever there was a *special exigency*, one which demanded that the court should do all that courts can do, it was disclosed by this bill, and we need not turn to the public history of the day, which only reaffirms with clearest emphasis all its allegations . . ." (Emphasis supplied).

It is clear that the Court considered the situation there to be one bordering on a national emergency. Furthermore, since among the powers *expressly* given to the national government by the Constitution are the control of interstate commerce and the creation and management of a post office system (see Art. I, Sect. 8, Para's Third and Seventh), and Congress had enacted numerous statutes to implement these mandates, the actions of the strikers constituted a direct challenge to these functions.

In view of this, the Court reasoned that considering that "[t]he entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights entrusted by the Constitution to its care" (Id., at page 582, 15 S.Ct. at page 905), "the right to use force [did] not exclude the right of appeal to the courts for a judicial determination and for the exercise

of all their powers of prevention" (Id., at page 583, 15 S.Ct. at page 905). Additionally, the Court held, the Government's interest in appearing as a party Plaintiff could not be doubted, in that "the United States have a property in the mails, the protection of which was one of the purposes" of the injunction. Id.

The Court goes on to say, (at page 584, 15 S.Ct. at page 906):

"We do not care to place our decision upon this ground alone. *Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare*, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in *injury to the general welfare*, is often of itself sufficient to give it a standing in court. This proposition in *some* of its relations has heretofore received the sanction of this court." (Emphasis supplied).

The example given refers to the right of the United States to bring an action to cancel a patent for land obtained from it by fraud, and a similar suit to set aside a patent for an invention. The Court continues to say, at pages 586–587, 15 S.Ct. at page 907:

"It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, *whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights*, then the mere fact that the government has no pecuniary interest in the controversy is

not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties.

"The national government, given by the Constitution power to regulate interstate commerce, has by express statute assumed jurisdiction over such commerce when carried upon railroads. It is charged, therefore, with the duty of keeping those highways of interstate commerce free from obstruction, for it has always been recognized as one of the powers and duties of a government to remove obstructions from the highways under its control.

.     .     .     .     .

"... Indeed, the obstruction of a highway is a public nuisance ..., and a public nuisance has always been held subject to abatement at the instance of the government..." (Emphasis supplied).

It is obvious that the situation in *Debs* is *sui generis*, or at least, very restricted in nature, and cannot be compared to the private wrongs that may be or have been inflicted on Plaintiffs in this case, irrespective of how opprobrious these may be, a matter which we are obviously not deciding at this time.

■ There is no constitutional or legislative mandate (leaving aside for the moment Pub.L. 96–247), authorizing Plaintiff–Intervenor's general oversight or vindication of Plaintiffs' rights by way of a lawsuit. In this respect, the reasoning of *United States v. Solomon*, 419 F.Supp. 358 (D.Md., 1976), affirmed 563 F.2d 1121 (C.A.4, 1977), is highly persuasive.

We need not delve to any great length on the contents of Judge Northrop's excellent analysis and conclusions in that decision. Suffice it to say that in the present case, as in *Solomon*, the government is not claiming that its power to sue stems from a burden on interstate commerce, wherefore its present reliance on *Debs* is clearly misplaced, and that none of the statutes cited in either the Complaint in Intervention or memoranda provide the slightest inkling or

tacit sanction to the broad authority to sue that is claimed by Plaintiff–Intervenor in this case. See also *United States v. Mattson*, 600 F.2d 1295 (C.A.9, 1979); *United States v. City of Philadelphia*, 482 F.Supp. 1248 (E.D.Pa., 1979), on appeal. (Appeal No. 80–1348, C.A.3).

The attempt by the Government to distinguish the standing requirements of an original plaintiff vis–a–vis those of an intervenor are without substance. See *Warth v. Seldin*, supra.

We thus conclude that absent statutory authority Plaintiff–Intervenor lacks standing in this suit. See generally also, "Nonstatutory Executive Authority to Bring Suit", 85 Harv.L.Rev. 1566 (1972).

*Post Pub. L. 96–247*

■ As previously quoted, the Supreme Court in *Warth v. Seldin*, supra, said that " . . . Congress may grant an express right of action to persons who would otherwise be barred by prudential standing rules." This of course, is still subject to Article III requirements that "plaintiff . . . allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." Id.

Under the apparent aegis of this language, Congress enacted on May 23, 1980, the "Civil Rights of Institutionalized Persons Act", Pub.L. 96–247 (hereinafter referred to as the "Act").

The Joint Explanatory Statement of the Committee of Conference gives us clear insight into the reasons behind the enactment of this Statute and the Attorney General's authority, or lack thereof, to litigate in this field prior to the passage of this Bill (Conference Report, accompanying HR 10, Report 96–897, April 22, 1980, at page 9 U.S. Code Cong. & Admin.News 1980, pp. 787, 833):

> "[The Justice Department's] litigation program stands threatened by two recent Federal court decisions. District courts in both Maryland and Montana recently ruled that, absent express statutory authority, the Attorney General lacked standing to initiate civil actions challeng-

ing conditions in two State facilities for the mentally retarded. Both suits were recently upheld on appeal.

. . . . . . . .

. . . The Maryland and Montana decisions make clear that without a Federal statute clarifying the Attorney General's authority to initiate *and to intervene in such suits*, the Department's litigative efforts to protect the institutionalized will be paralyzed.

*H.R. 10 provides that authority.* It creates no new substantive rights. It simply gives the Attorney General legal standing to enforce existing constitutional and Federal statutory rights of institutionalized persons. By codifying the authority of the Attorney General to initiate *and to intervene in suits* to redress serious and pervasive patterns of institutional abuse, H.R. 10 insures that institutionalized citizens will be afforded the full measures of protections guaranteed them by the Constitution of the United States." (Emphasis supplied).

This is to us the most patent of reasons for reinforcing our thinking that no such authority to intervene existed pre–P.L. 96–247. But be that as it may, we will assume for present purposes that the Complaint for Intervention "allege[s] a distinct and palpable injury" to Plaintiff–Intervenor, and that therefore "[r]esolution of the standing question is accordingly governed by the new Act." *United States v. Elrod*, 627 F.2d 813 (C.A.7, 1980), at page 819; *Bradley v. School Bd. of the City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). For these purposes we conclude that the application of the Act to the present controversy, at this stage and because of its background, meets the tests enunciated in *Bradley* for determining whether manifest injustice will result to the parties from applying the change in law. Cf. *United States v. Alabama*, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960); *United States v. Fresno Unified School District*, 592 F.2d 1088 (C.A.9, 1979), cert. den. 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979);

*Martínez Rodríguez v. Jiménez*, 551 F.2d 877 (C.A.1, 1977).

We are thus concerned with Section 5 of the Act, which is the part that grants the authority to the United States to intervene in these type of suits. It is important that this section be carefully read:

"Sec. 5. Intervention in Actions.

(a)(1) Whenever an action has been commenced in any court of the United States seeking relief from egregious or flagrant conditions which deprive persons residing in institutions of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing them to suffer grievous harm and the Attorney General has reasonable cause to believe that such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities, the Attorney General, for or in the name of the United States, may intervene in such action upon motion by the Attorney General.

(2) The Attorney General shall not file a motion to intervene under paragraph (1) before 90 days after the commencement of the action, except that if the court determines it would be in the interests of justice, the court may shorten or waive the time period.

(b)(1) *The Attorney General shall certify to the court in the motion to intervene filed under subsection (a).*

(A) that he has notified in writing, at least fifteen days previously, the Governor or chief executive officer, attorney general or chief legal officer of the appropriate State or political subdivision, and the director of the institution of—

(i) the alleged conditions which deprive rights, privileges, or immunities secured or protected by the Constitution or laws of the United States and the alleged pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities;

(ii) the supporting facts giving rise to the alleged conditions, including the dates and time period during which the alleged

conditions and pattern or practice of resistance occurred; and

(iii) to the extent feasible, and consistent with the interests of other plaintiffs, the minimum measures which he believes may remedy the alleged conditions and the alleged pattern or practice of resistance; and

(B) that he believes that such intervention by the United States is of *general public importance* and will materially further the vindication of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

(2) Any certification made by the Attorney General pursuant to this subsection shall be *personally signed by him.*

(c) Any motion to intervene made by the Attorney General pursuant to this section shall be *personally signed by him.*" (Emphasis supplied).

It is clear from the above, that Congress' grant of authority to intervene, as in the case of the Sections 3 and 4 authority to initiate *ab initio* suits, was not a blanket one. This is a reflection of the legislative history expressed in the Conference Report to the effect that the Attorney General be "[m]indful of the importance of harmonious Federal–State relations", in that ". . . Congress believes it advisable to give States the primary responsibility for correcting unconstitutional conditions in their own institutions and to attempt to reach an agreement on the necessary remedies to correct the alleged conditions through informal and voluntary methods." Conference Report, supra, at p. 13, U.S.Code Cong. & Admin. News 1980, p. 837. In view of the lack of success that prior legislative proposals in this field had, it is apparent that the above–mentioned restrictions on the Attorney General's authority to sue or intervene, were compromises reached in the legislative forum to attain passage of the Act. See *United States v. City of Philadelphia*, supra, 428 F.Supp. pp. 1253–1257; *United States v. Solomon*, supra, 419 F.Supp. pp. 370–371.

Since as we have previously concluded, Plaintiff–Intervenor lacked standing to intervene in this suit prior to the passage of

the Act, insistence upon compliance with the conditions which allow for the exercise of that authority can hardly be called "wooden" or "pointless", as is claimed by Government counsel. In fact the very case cited by said counsel in its communication of August 22, 1980, holds otherwise. *United States v. Elrod*, supra, at page 819.

As in that case however, if this action truly involves matters of "general public importance", we believe the Attorney General should be given an opportunity to comply with the requirements of Section 5 rather than to suffer outright dismissal at this stage. Considering the state of the present proceedings, if the Attorney General concludes that intervention is warranted, compliance should be effectuated expeditiously and in no event later than 30 days henceforth.

Final outcome of this matter shall therefore await the expiration of said time period, unless earlier compliance or indication of voluntary withdrawal is filed by counsel for the Government. Thereafter a status conference shall be set for the early conclusion of this controversy.

IT IS SO ORDERED.